**Lynne H. ORNOFF, Appellant,**

v.

**KUHN AND KOGAN CHARTERED, Appellee.**

**No. 86–316.**

District of Columbia Court of Appeals.

Argued June 28, 1988.

Decided Nov. 4, 1988.

---

Lois R. Goodman, Washington, D.C., for appellant.

Leo A. Roth, Jr., with whom Sanford A. Friedman, Washington, D.C., and Gilbert L. Sussman, Silver Spring, Md., were on the brief, for appellee.

Before MACK and NEWMAN, Associate Judges, and PRYOR, Senior Judge.*

PER CURIAM:

On this appeal from the trial court's entry of a directed verdict for appellee in a claim for payment of medical fees, and a counterclaim for medical malpractice, appellant contends (i) that the trial court abused its discretion in denying the proffered testimony of her medical expert; and (ii) that there was sufficient evidence which should have been presented to the jury. Concluding that appellant is right on both

* Judge Pryor was Chief Judge of this court at the time of argument. His status changed to Senior Judge on November 2, 1988.

scores, we reverse and remand for a new trial.

I.

Dr. Israel Kogan, appellee, sued Lynne Ornoff, appellant, for nonpayment for medical services rendered in the amount of $1,018.40. Appellant counterclaimed alleging medical malpractice:

On May 25, 1982 ... a diagnostic laparoscopy was negligently performed on [appellant by appellee]. Said procedure, in which a slender tube is inserted into the peritoneal cavity through an incision in the abdominal wall to examine the pelvic region, was undertaken with insufficient medical skill and in ignorance of the fact that [appellant] suffered from a clotting deficiency ... which rendered this procedure hazardous to the life and health of [appellant].

Appellant further contended that, because of the alleged negligence in the performance of the laparoscopy, she suffered internal bleeding "to a life-threatening degree" and "[a]s a further result thereof, it was necessary for [her] to undergo a total hysterectomy."

Appellant's medical expert, Dr. Margaret Rick, was, at the time of trial, assistant chief in the hematology section for the clinical center which is associated with the National Health Institute. Dr. Rick was board certified in internal medicine and hematology. She had published some thirty to thirty-five articles on the hematological aspects of blood coagulation and was recognized by the court as an expert in hematology.

Dr. Rick proffered testimony as to the applicable standard of care, the alleged breach of the standard, and the causal relationship between the violation and the harm complained of. She told the court that, after reviewing appellant's records, she had concluded that appellant "had

Factor XI blood deficiency,[1] and this would [have] contribute[d] to bleeding in this area" (*i.e.,* appellant had contended that she suffered from "a massive hematoma" (swelling containing blood in the abdominal area) due to the laparoscopy).

As to the standard of care, Dr. Rick noted, from her perspective as a hematologist, that the partial thromboplastin time (PTT) test should be done "preoperatively in surgical procedures that the body cavity or abdominal cavity is open. The reason for this is because this may indicate a mild deficiency of several of the blood clotting factors that you would then be aware of before the surgery took place." Dr. Rick also stated that after surgery is completed, it is impossible to see "whether bleeding is occurring internally"; thus the PTT test is an important diagnostic tool. The trial court inquired as to Dr. Rick's competency to testify as an expert in this area:

> [I]f you were to testify … and be asked for an expert opinion concerning whether, in 1982, a specialist in the field of obstetrics and gynecology who was to do laparoscopy should have done some pretesting on coagulation problems or platelet problems with blood, what base would you be relying on in giving your answer as to what the standard of care would be?

In response, Dr. Rick noted that

> [t]he standard of care of any surgical procedure, whether it be an OB/GYN, or general surgery or other special surgery, is connected in a very practical way to hematology, in the sense that the bleeding problems occur as one aspect of the surgical procedure and, … would be addressed as part of the standard.

Thus, if allowed to testify, Dr. Rick would have concluded that Dr. Kogan "violated the standard of care required nationally by not performing a simple and inexpensive blood clotting factor screening test to de-termine if any problems might exist before performing a laparoscopy."

Dr. Rick proffered additional testimony that bleeding complications for laparoscopy are relatively rare, and that when a patient (*i.e.,* appellant) calls a doctor six times post-operation (complaining of pain and swelling), every effort should be made to see the patient immediately; that Dr. Kogan's post-operation visual examination of appellant was insufficient to reveal the location of internal bleeding; that the Bufferin aspirin that Dr. Kogan prescribed aggravated appellant's bleeding (*i.e.,* the Bufferin was contraindicated); and that "standards for doctors are not set strictly within specialities, particularly when a procedure is done cross specialty, obstetricians and gynecologists rely on hematologists for the bleeding standards with reference to doing obstetrical and gynecological procedures."

At the conclusion of appellant's proffer, appellee argued that Dr. Rick was not competent to testify as to the standard of care for OB/GYNs performing laparoscopies. The trial court agreed and excluded Dr. Rick's testimony:

> It is clear from the testimony of Dr. Rick … that she is not familiar with the standard of care that is applicable to obstetricians and gynecologists. She has so stated herself she doesn't know what it is. She is a hematologist, there's no doubt about that, and I've accepted her as an expert in that area … you've [appellant] asked that she be accepted in [internal medicine] as an expert, and I will do so, but, that is different than saying that she is competent to testify as to whether or not the [national] standard of care [2] [applicable to obstetrics and gynecology] … in performing a laparoscopy have been violated…. [I]t is clear that she cannot offer an opinion as to

1. In Jewish people of Ashkenazi origin, the incidence of this clotting deficiency may be as high as five to ten percent. Appellant is Jewish and of Ashkenazi descent.

2. Throughout this opinion, we refer to "standard of care." This term is synonymous with the national standard of care to which all health care providers, in the District of Columbia, are held. *See Capitol Hill Hosp. v. Jones,* 532 A.2d 89 (D.C.1987); *Morrison v. MacNamara,* 407 A.2d 555, 565 (D.C.1979); *Robbins v. Footer,* 179 U.S.App.D.C. 389, 392–93, 553 F.2d 123, 126–27 (1977).

what the standard was and whether it was violated.

Appellant utilized two other experts in the presentation of her case. At the close of appellant's evidence, appellee moved for a directed verdict. In granting appellee's motion, the trial court concluded that "there is no evidence of any deviation from the standard of care in performing the laparoscopy." In exercising its power to admit or exclude testimonial evidence, the trial court concluded that appellant failed to introduce evidence (particularly in light of Dr. Rick's "admission" that she did not know the applicable standard of care used by the American College of Obstetricians and Gynecologists (ACOG)) that established the standard of care, violation of the standard, and a causal link between the viotion and the harm complained of. Since the trial court concluded that appellant failed to establish a breach by appellee of the applicable standard of care, it also entered a directed verdict in appellee's claim (for nonpayment for medical services rendered) against appellant. This appeal followed.

## II.

It is well established that, in a malpractice action, a *prima facie* case must consist of evidence that establishes the applicable standard of care, that demonstrates that this standard has been violated, and that develops a causal relationship between the violation and the harm complained of. *See Kosberg v. Washington Hospital Center, Inc.*, 129 U.S.App. D.C. 322, 324, 394 F.2d 947, 949 (1968); *accord District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C.1984); *Tompkins v. Washington Hospital Center, Inc.*, 433 A.2d 1093, 1095 n. 2 (D.C.1981); *Morrison v. MacNamara, supra* note 2, 407 A.2d at 560. While we recognize that "the qualification of a particular witness to testify as an expert is largely within the domain of the trial judge," *Jenkins v. United States*, 113 U.S.App.D.C. 300, 308 n. 19, 307 F.2d 637, 645 n. 19 (D.C.1962) (en banc); *Sher v. De Haven*, 91 U.S.App.D.C. 257, 262, 199 F.2d 777, 782 (1952), *cert. denied*, 345 U.S. 936, 73 S.Ct. 797, 97 L.Ed. 1363 (1953), we,

nevertheless, conclude that the trial court, in the instant case, abused its discretion in concluding that Dr. Rick was incompetent to testify. Appellant has described her perception of the error thus: "The trial court appears to have a standard ... that a doctor can only testify within his specialty (*i.e.*, hematology) or about another specialty (*i.e.*, obstetrics and gynecology) if [she] is knowledgeable about all of their standards. It is not necessary that a physician be knowledgeable about all of the standards of another specialty.... It is only necessary that the physician be knowledgeable about the subject matter about which he or she is testifying." We find this reasoning persuasive.

The problem arises here because of too much focus on a specialty and too little focus upon the breach alleged. Appellant's claim was not that there was a breach of the standard of care in obstetrics or gynecology (*i.e.*, the laparoscopy in itself was performed improperly), but rather that malpractice occurred as a result of Dr. Kogan's failure to perform the PTT test prior to the laparoscopy and failure to follow through with proper post-operative treatment. This case, therefore, is not about the standard of care in obstetrics or gynecology; it is about whether a patient's hematoma (and subsequent hemorrhaging) could have been avoided through pre-surgical testing and subsequent treatment. From the record, it is apparent that the trial court based its decision to exclude Dr. Rick's testimony on the fact that she was not familiar with the ACOG's publication which outlined standards and guidelines for OB/GYNs. This was an erroneous basis upon which to disqualify appellant's medical expert because it was conditioned upon Dr. Rick's overall knowledge of a particular specialty rather than the breadth of her expertise as to the hematological consequences of surgery.

Appellant persuasively argues that "from a hematological point of view, cutting through the abdominal wall is the same, no matter whose hand does it, and the same safety procedures must apply, [regardless] of the specialty." Indeed Dr.

Kogan concedes, in this court, that "a physician need not be a specialist in the field of which he speaks in order to testify as an expert." *Baerman v. Reisinger,* 124 U.S. App.D.C. 180, 181, 363 F.2d 309, 310 (1966) (quoting *Sher v. De Haven, supra,* 91 U.S. App.D.C. at 262, 199 F.2d at 782 ("[i]t is settled law that '[a] physician is not incompetent to testify as an expert merely because he is not a specialist in the particular field of which he speaks' "); *see, e.g., Kosberg v. Washington Hospital Center, Inc., supra,* 129 U.S.App.D.C. at 324, 394 F.2d at 949 ("[t]he fact that an internist is not a specialist in psychiatry or neurology does not preclude him from testifying about the physical effects of electroshock therapy"). Here, Dr. Rick could have offered testimony as to the standard of care in performing surgery (in the context of hematology); the effect a breach of the standard of care would have on a person with a Factor XI blood deficiency; and whether there is a causal linkage between appellant's hematoma and any possible violation of the national standard of care. Indeed, her testimony, "if believed by the jury, might have established both the standard of care and its violation." *Id.* The exclusion of this testimony has effectively precluded appellant from establishing her claim.

■ We likewise conclude that the trial court erred when it entered a directed verdict on appellant's medical malpractice claim. Viewing the evidence in the light most favorable to appellant, we conclude that reasonable minds could differ on the issue of Dr. Kogan's negligence. *See Johnson v. Weinberg,* 434 A.2d 404, 407–08 (D.C.1981) (citing *Corley v. BP Oil Corp.,* 402 A.2d 1258, 1263 (D.C.1979); *Seganish v. District of Columbia Safeway Stores, Inc.,* 132 U.S.App.D.C. 117, 122, 406 F.2d 653, 658 (1968)). In the light most favorable to appellant, there was evidence that she suffered from a congenital clotting deficiency; that Dr. Kogan performed a laparoscopy and shortly thereafter she developed hematoma; that she called Dr. Kogan some six times complaining of post-operative pain; that Bufferin was prescribed which may have aggravated her hematoma; and that her clotting deficiency was discovered by another doctor[3] who conducted preliminary tests prior to performing a hysterectomy. The trial judge should have allowed the jury to consider this evidence, as well as Dr. Rick's proffered testimony as to the standard of care, breach of the standard, and causation.[4]

REVERSED AND REMANDED.

---

**3.** Dr. Muhlendorf, in a diagnostic report which is a part of the record, noted that "[appellant's] clotting functions showed a very abnormal PTT in the range of 60, and for this reason she was seen by [three hematologists]. Their evaluation revealed a very high reticulocyte count and consistently abnormal PTTs.... It was for this reason that she underwent a thorough evaluation of her intrinsic clotting system, which revealed that [appellant] has an apparent inherited factor XI deficiency." In arguing in support of his motion for directed verdict, appellee conceded that Dr. Muhlendorf testified that "he would have gotten a hemoglobin test per-

formed, and that ... it was a deviation [from the standard of care] not to perform the test." Nevertheless, appellee contends that "if it [was] a deviation not to do the hemoglobin test ... there is no damage from it."

**4.** Since the trial court's directed verdict on appellant's counterclaim for medical malpractice was "interrelated" to appellee's claim for medical services rendered, we conclude that the trial court erred in entering a directed verdict on the latter claim as well.