DISTRICT OF COLUMBIA,
et al., Appellant,

v.

Will Rogers ANDERSON, Appellee.

Will Rogers ANDERSON, Appellant,

v.

Virgil DAVIS, et al., Appellee.

No. 89–1281, 89–1375.

District of Columbia Court of Appeals.

Argued May 21, 1991.
Decided Oct. 4, 1991.

James C. McKay, Jr., Asst. Corp. Counsel, with whom Herbert O. Reid, Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellant/cross-appellee.

Joseph J. Bernard, Washington, D.C., for appellee/cross-appellant.

Before ROGERS, Chief Judge, and FERREN and FARRELL, Associate Judges.

ROGERS, Chief Judge:

Appellee/cross-appellant Will Rogers Anderson (Mr. Anderson) brought this suit against appellants/cross-appellees the District of Columbia and its employee, Dr. Virgil Davis (referred to collectively as the District). Mr. Anderson alleged that while he was imprisoned at District correctional facilities, he was given negligent medical care by Dr. Davis and other District employees, resulting in the amputation of both of his legs. The trial judge granted a partial directed verdict to the District, ruling that there was insufficient evidence that the District was responsible for the loss of Mr. Anderson's right leg. The jury found for Mr. Anderson, and both parties appealed.

The District contends on appeal that (1) the trial judge should have granted it a directed verdict, (2) the judge erred in refusing to strike a juror for cause, and (3) a new trial is required on the issue of damages. We reject the District's first two contentions but agree that a new trial is required on damages. We find no merit to Mr. Anderson's cross-appeal.

## I.

In 1953 Mr. Anderson was convicted of armed robbery, for which he served twelve years in prison. He was released on parole, and spent approximately twenty years working as a cook and chef in various restaurants in the District of Columbia. In 1984 Mr. Anderson moved to Annapolis, Maryland without prior authorization from the parole authorities, which was a violation of the terms of his parole. He was arrested in May 1984, and brought to a jail in Anne Arundel County to await transfer to the District of Columbia Jail. At the Anne Arundel jail Mr. Anderson was informed for the first time that he had diabetes. He was given oral medication by the jail authorities.

In June 1984 Mr. Anderson was transferred to the D.C. Jail. When he told the correctional authorities that he was a diabetic, Dr. Lynnette Mundy, a physician at the D.C. Jail, prescribed oral medication to treat the diabetes. Mr. Anderson complained of dizziness one week later, and again in October. On November 7, 1984, he reported a cold sensation in his left foot. Finally, on November 19, 1984, Mr. Anderson complained to a physician's assistant at the jail that he had been experiencing numbness and tingling in his left calf and great toe for the past two weeks. The physician's assistant noted that the main artery carrying blood to the left foot had a good flow, but the secondary artery had a diminished flow. Although the assistant ordered a referral to the District of Columbia General Hospital for vascular testing, the order was never carried out.

On November 26, 1984, Mr. Anderson continued to experience a numbness, tingling and burning sensation in his left leg, and he placed his name on sick call to see Dr. Mundy. The doctor diagnosed Mr. Anderson as having diabetic neuropathy, and prescribed medication in order to treat the symptoms. Dr. Mundy noticed that the previous referral for vascular testing had not been carried out, but did not consider

that unusual.[1]

Two days later, on November 28, 1984, Mr. Anderson saw Dr. Virgil Davis, a podiatrist, in order to have his toenails trimmed; prisoners were not permitted to have nail files. In the course of trimming Mr. Anderson's toenails, the doctor cut the fifth toe of Mr. Anderson's left foot.[2] Dr. Davis gave Mr. Anderson an antiseptic ointment to apply periodically to the open wound. The doctor did not write on the consultation chart that follow-up care was to be arranged for Mr. Anderson.

The next day, on November 29, 1984, Mr. Anderson was transferred from the D.C. Jail to the District's correctional facility in Occoquan, Virginia. In accordance with prison procedure Mr. Anderson's medications—both the diabetes medicine and the antiseptic ointment—were taken from him before he was transported to the new institution. Mr. Anderson was told that he should sign up for sick call at Occoquan in order to have new medication prescribed. Mr. Anderson put his name on sick call, but did not see any medical personnel until the next day, December 4, 1984. He informed the staff doctor on that date about the removal of his foot medication and the continued pain he was experiencing. Mr. Anderson's condition worsened, until he was finally brought to D.C. General Hospital on December 25, 1984. Eventually, Mr. Anderson's left leg was amputated at the knee.

On July 31, 1985, Mr. Anderson was released from the District's correctional facility into the community. Upon release, his diabetes medication was taken from him and he was told by an unidentified corrections official that he no longer needed medicine to control his diabetes. He was advised to make an appointment with D.C. General Hospital for a prosthesis fitting. When Mr. Anderson went for his fitting, he was told that the stump was infected, and to return after the infection subsided. Before the infection went away, however, Mr. Anderson began to experience problems with his right leg. He felt a tingling in his toes, similar to the symptoms he had previously experienced with his left foot. Mr. Anderson saw a private physician, who prescribed medication and referred him to another doctor. Mr. Anderson, who explained that he had a "hangup ... about seeing all those doctors," waited two months before making an appointment. When he did see the new doctor, he was told to come to the hospital immediately or risk losing his foot. Mr. Anderson delayed another two months, however, until he finally entered the Anne Arundel General Hospital in January 1986. After several operations, Mr. Anderson's right leg was amputated below the knee.

Mr. Anderson sued the District of Columbia and Dr. Davis, alleging that their negligence was responsible for his loss of both legs. Although the trial judge denied the District's motion for directed verdict, the judge ruled that the jury would be limited to considering whether the District was liable for the loss of Mr. Anderson's left leg. The jury found for Mr. Anderson, and awarded him $950,000. Both sides appealed.

## II.

The District raises several challenges to the trial judge's actions.

### A. *The Directed Verdict.*

■ "In a negligence action predicated on medical malpractice, the plaintiff must carry a tripartite burden, and establish: (1) the applicable standard of care; (2) a deviation from that standard of care by the defendant; and (3) a causal relationship between that deviation and the plaintiff's injury." *Washington v. Washington Hosp. Center*, 579 A.2d 177, 181 (D.C.1990).

---

1. Dr. Mundy explained that "[d]epending on the waiting list, it may be months, it may be weeks, it may be the next week [before a referral for testing is carried out]. So it is not unusual for me to pick up a chart on November 26th and see a patient who is referred on the 19th for testing, and not have a result on the chart."

2. Dr. Davis testified that he intentionally lanced a bleb, or blister, on Mr. Anderson's toe, in order to let the fluid out. Mr. Anderson testified, by contrast, that Dr. Davis accidentally cut his toe while trimming the toenails.

The District contends that Mr. Anderson failed to carry this burden, and the trial judge therefore should have granted the District's motion for a directed verdict.

■ The jury, by special verdict form, found for Mr. Anderson on the basis of three different theories: (1) "D.C. Department of Corrections medical staff was negligent in failing to make [Mr. Anderson's] diabetes and antibiotic medications available to him during the period 11/29 to 12/4/84"; (2) "D.C. Department of Corrections medical staff was negligent in failing to perform vascular test on [Mr. Anderson] during the period 11/19/84 to 1/17/85"; (3) "Dr. Davis was negligent in failing to arrange follow-up care for [Mr. Anderson's] toe." We conclude that Mr. Anderson presented sufficient evidence to support the first theory, see *Corley v. British Petroleum Oil*, 402 A.2d 1258, 1263 (D.C.1979) (on review of directed verdict, evidence to be viewed most favorably to nonmoving party, giving benefit of all reasonable inferences from the evidence), and that the judge thus correctly denied the District's motion for a directed verdict.[3]

Mr. Anderson offered the expert testimony of Dr. Gottlieb, a podiatrist, who testified that removing the antiseptic ointment for the five-day period breached the appropriate standard of care:

Q [by Mr. Anderson's counsel]: Would it be a violation of the standard of care if the Vacitracin, [sic] the infection ointment, were removed from Mr. Anderson on November 30th, approximately, and kept away from him for a 2 or 3 day period?

A [by Dr. Gottlieb]: Yes, it would.

Dr. Gottlieb also testified that removing the medication caused the infection, and that the infection led to the development of dry gangrene, which necessitated the amputation:

Q [by Mr. Anderson's counsel]: [H]ypothetically, assuming that Mr. Anderson's diabetic and infection-preventing medication was taken away from him on approximately November 30th, 1984, and he received no diabetic and no antiseptic medication until December 4, 1984, or approximately 4 or 5 days later, could you express an opinion within reasonable medical certainty or probabilities as far as whether his left toe, foot were to become infected?

\* \* \* \* \* \*

A [by Dr. Gottlieb]: It would greatly contribute to the development of an infection on that toe.

Q: What's the basis for that opinion?

A: Well, essentially, you have an uncontrolled diabetic with pre—an injury that is predisposing to an infection that's been untreated, leaving it exposed to the environment and to the development of contamination, without any, you know, prevention.

\* \* \* \* \* \*

Q: Would the infection have any affect [sic] on the vascularity in the foot area?

A: It is a—it's an assault on the foot.... [T]he assault of the tissues of an infection requires sufficient vascularity to allow the tissues to heal, heal the infection and to heal even for a cut, and in the presence of decreased circulation, and additional insult overtaxes the body's ability to recuperate or deal with it, and it essentially will shut down.

\* \* \* \* \* \*

THE COURT: [W]hat do you mean by "Shut down"?

A: That it refers to the vascular system, vascularity of the toe or the part of the foot, and in the case of a person with poor circulation, a lot of times they have sufficient circulation to allow the tissues

---

3. Because of the disposition, we need not consider whether the trial judge erred in denying the District's motion for a directed verdict on the other theories of negligence found by the jury. We note, however, that although there was ample expert testimony showing that the District's failure to perform a timely vascular test deviated from the standard of care, neither of the plaintiff's experts offered an opinion that the failure to perform vascular testing caused Mr. Anderson's injuries. Nor did any expert offer an opinion that the failure to follow up on Mr. Anderson's condition caused the ultimate injuries.

to maintain itself, but not to necessarily heal if it's been given an assault such as a cut or infection. There's not enough circulation to allow the tissues to repair itself, so the body essentially tries to cut off that part of the foot, or that part of the body, and circulatory—the microvasculature, at that point, will essentially close itself off, which then progresses to the development of dry gangrene.

From this evidence the trial judge, who denied the District's motion for a directed verdict, could properly conclude that Dr. Gottlieb's testimony established that, at a time when the diabetes was out of control, the infection could so overtax the body's capacity to deal with it, that the vascularity of the toe and foot would eventually "shut down," eventually causing the dry gangrene.[4]

The District maintains, however, that Dr. Gottlieb's opinion on causation was inadmissible because it exceeded Dr. Gottlieb's competence as a podiatrist, and because it was based on the unsubstantiated assumption that Mr. Anderson's diabetes was out of control during the five-day period in which his medication was unavailable.[5] These contentions are unpersuasive.

■ The court has long held that expert testimony is designed to aid the trier of fact, *Abbey v. Jackson*, 483 A.2d 330, 334 (D.C.1984), and that "[t]he decision to admit expert testimony lies within the sound discretion of the trial court, whose ruling will be sustained unless clear abuse of discretion is shown." *Rotan v. Egan*, 537 A.2d 563, 570 (D.C.1988). The court has also recognized that a medical expert need not be a specialist in order to be qualified to offer an opinion. *See, e.g., Ornoff v. Kuhn & Kogan, Chartered*, 549 A.2d 728, 731 (D.C.1988); *Baerman v. Reisinger*, 124 U.S.App.D.C. 180, 363 F.2d 309 (1966) (a general practitioner with "experience in treating patients suffering from hypothyroidism" should have been permitted to give expert opinion even though he was not

a specialist). Although our prior decisions have involved medical doctors, and Dr. Gottlieb is a podiatrist, not a medical doctor, the import of our cases is that "it is the actual qualifications of the witness that count, rather than his [or her] title.... Just as the wrong title may mean that the witness is nevertheless qualified, the right title will not suffice if the witness does not have the qualifications required by the facts of the case." 3 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 702[04] at 702–51 (1990). We therefore agree with those courts which have concluded that a nonmedical person is not automatically barred from offering testimony on medical issues, provided the witness has sufficient knowledge and experience to offer an informed judgment. *See Diviak v. Shulefand*, 140 A.D.2d 950, 530 N.Y.S.2d 713, 714 (A.D. 4 Dept.1988) ("the fact that plaintiff's expert is a podiatrist does not render him incompetent to state his expert opinion of defendant's medical malpractice"); *Alexander v. Mount Carmel Medical Center*, 56 Ohio St.2d 155, 383 N.E.2d 564 (1978) (abuse of discretion to exclude podiatrist's expert testimony about the standard of care for an orthopedic surgeon). As Professor Wigmore has explained:

> The common law ... does not require that the expert witness on a medical subject shall be a person duly licensed to practice medicine ... because the line between chemistry, biology, and medicine is too indefinite to admit of a practical separation of topics and witnesses; and ... because some of the most capable investigators have probably not needed or cared to obtain a license to practice medicine.

3 J.H. WIGMORE, EVIDENCE § 569 at 789–90 (Chadbourn rev. 1970) (emphasis deleted). *Accord*, 2 S. GARD, JONES ON EVIDENCE § 14.13 (1972) ("Nor is the lack of a license [to practice medicine] necessarily a bar to accepting the person as a witness, as learn-

---

4. The transcript of the judge's ruling refers to the diabetes being "under control." In view of Dr. Gottlieb's opinion to which the trial judge was referring, this appears to be either an inadvertent misstatement cr a transcription error.

5. According to Dr. Gottlieb, a person's diabetes is "out of control" if the blood sugar content is above the normal range.

ing and experience may provide the essential elements of qualification").[6]

▮ The trial judge therefore properly examined Dr. Gottlieb's qualifications to determine whether his "knowledge, skill, training or education," FED.R.EVID. 702, rather than his title, was sufficient for him to offer an opinion that could aid the trier of fact. Dr. Gottlieb testified that he was a podiatrist, a "specialist in foot care," having graduated from a four-year postgraduate college of podiatric medicine. He had been in practice for seven years, after apprenticing with his father, who was also a podiatrist. Dr. Gottlieb studied "how to attend the feet of diabetics" in podiatry school, including a course in peripheral vascular disease. Roughly one third of Dr. Gottlieb's patients are diabetics, half of whom suffer from peripheral vascular disease. Dr. Gottlieb further testified that he had taken courses on diabetes in podiatry school, and in continuing education over the past seven years. Given this foundation, we find no clear abuse of discretion by the trial judge in ruling that Dr. Gottlieb was qualified to testify as an expert in podiatry, and to offer an opinion that the withdrawal of the medication caused dry gangrene. Dr. Gottlieb had training and experience in the area of direct relevance to Mr. Anderson's negligence claims, and the fact that he was not licensed to treat general systemic disease did not automatically make him incompetent to express an opinion about such a disease involving a diabetic.[7]

▮ We similarly find unpersuasive the District's contention that Dr. Gottlieb's opinion on causation was inadmissible because it was based on an unsubstantiated factual assumption. An expert may give an opinion on the basis of hypothetical facts, but those facts "must be established by independent evidence properly introduced." *John McShain, Inc. v. L'Enfant Plaza Properties*, 402 A.2d 1222, 1226–27 (D.C.1979) (quoting *Logsdon v. Baker*, 366 F.Supp. 332, 336 (D.D.C.1973), *vacated*, 170 U.S.App.D.C. 360, 517 F.2d 174 (1975)). Dr. Gottlieb made clear that his opinion on causation rested on the assumption that Mr. Anderson's diabetes was out of control between November 29 and December 4, 1984. The facts underlying an expert opinion do not have to be uncontroverted; they need only be "supported by the evidence." *John McShain, Inc. v. L'Enfant Plaza Properties, supra*, 402 A.2d at 1226 (quoting *Logsdon v. Baker, supra*, 366 F.Supp. at 336). Although no test was performed between November 29 and December 4, 1984, to determine whether Mr. Anderson's diabetes was out of control, other evidence supports Dr. Gottlieb's inference that the diabetes was out of control at that time. Mr. Anderson suffered from symptoms on November 28, 1984, including "numbness to the left foot and ache," which, Dr. Gottlieb explained, "could be an indication of

---

6. The District cites cases from other jurisdictions that have adopted the "school of medicine" doctrine which requires that "the expert who establishes the practitioner's deviation from the pertinent standard of care must be … a licensed member of the school of medicine about which he opines." *Novey v. Kishwaukee Community Health Servs. Center*, 176 Ill.App.3d 674, 678, 126 Ill.Dec. 132, 134, 531 N.E.2d 427, 429 (1988); *see also Young v. Key Pharmaceuticals, Inc.*, 112 Wash.2d 216, 226–29, 770 P.2d 182, 188–90 (1989) (en banc). Our decisions make clear, however, that although a license in the relevant specialty may be relevant in determining an expert's qualification, a judge does not commit an abuse of discretion in allowing a non-licensed witness to testify as an expert. *See, e.g., Kling v. Peters*, 564 A.2d 708, 716 (D.C.1989); *Ornoff v. Kuhn & Kogan, Chartered, supra*, 549 A.2d at 731; *see also Baerman v. Reisinger, supra*.

7. The District also refers to D.C.Code § 2–3301.-2(14) (1988), which defines the "practice of podiatry" as including "the diagnosis, treatment, or prevention of any ailment of the human foot by medical, surgical, or mechanical means," but excluding "the general medical treatment of any systemic disease causing manifestations in the foot." This statute governs the licensing of podiatrists, however, and does not purport to limit the capacity of podiatrists to testify in medical malpractice cases. We do not interpret the statute to mean that a trial judge commits a clear abuse of discretion in allowing a podiatrist to testify as an expert witness about a systemic disease and its impact on the foot. We note, moreover, that the District called a podiatrist as its expert witness to testify about causation.

diabetes out of control." The medical records indicate that Mr. Anderson's diabetes was out of control three weeks later, on December 20, 1984. The trial judge asked Dr. Gottlieb whether "the development of gangrene on December 20th [makes] it more or less likely that the diabetes was out of control ... earlier on November 28th," and Dr. Gottlieb responded that "[i]t makes it more likely that it would be out of control." Thus, given all of the circumstances, we conclude that the trial judge did not err in admitting Dr. Gottlieb's expert testimony on causation.[8] *See Pace v. Insurance Co. of N. Am.*, 838 F.2d 572, 578 (1st Cir.1988) (sufficient evidence of causation despite the fact that the "evidence supporting [the expert's opinion] depended upon inference"); *Polk v. Ford Motor Co.*, 529 F.2d 259, 271 (8th Cir.1976) ("[t]he weakness in the underpinnings of [an expert opinion] ... goes to the weight and credibility of the testimony," not to its admissibility).[9]

### B. *The Juror.*

■ The District also asserts that the trial judge erred in refusing to strike a juror for cause. On the second day of trial, after the jurors had been selected but before they were sworn, one of the jurors sent the trial judge a note:

> I have just learned that my mother is filing a medical malpractice suit against Howard University and their medical staff for a charge of irregularities and incompetence, concerning the death of my father, who died in October, 1988. So, in light of the pending case that I'm

about to serve on, I think it would cloud my judgment to give a fair and impartial decision.

Although both parties' counsel suggested that an alternate juror should be selected, the trial judge decided to question the juror on the record. During the questioning the juror indicated that his mother had called a family meeting for that night to discuss the possibility of bringing a medical malpractice action. At the request of the trial judge, the juror telephoned his mother, who agreed to postpone the family meeting until after the trial was over. The judge and counsel then questioned the juror to see if he could be impartial. Although his responses showed some ambivalence, the juror ultimately stated that he was confident that he would decide the case based on the evidence, without considering his mother's situation. The trial judge therefore denied the District's motion to disqualify the juror.

A trial judge has broad discretion in deciding whether to excuse a juror for cause. *Welch v. United States*, 466 A.2d 829, 836 (D.C.1983). The "determination of [a juror's] impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge." *Rease v. United States*, 403 A.2d 322, 325 (D.C.1979). "It is sufficient that the juror asserts he or she is able to lay aside his or her impressions and render a verdict based on the evidence presented in court and the court assures itself that this assertion is valid." *Welch, supra*, 466 A.2d at 836. In the instant case the judge took pains to

---

**8.** The District's reliance on a lab test showing that Mr. Anderson's diabetes was under control on December 25, 1984, is misplaced. The lab result is not inconsistent with Dr. Gottlieb's opinion. There was evidence that blood sugar levels change rapidly. Even if Mr. Anderson's diabetes medication was not fully controlling his diabetes, Dr. Gottlieb testified that the withdrawal would exacerbate, not mitigate, the control of his disease. In any event, in reviewing a trial judge's decision to deny a motion for judgment notwithstanding the verdict, we must view the evidence in the light most favorable to nonmovant. *Spain v. McNeal*, 337 A.2d 507, 508 (D.C.1975).

**9.** The District also complains that Dr. Gottlieb's causation opinion conflicted with the testimony

of Dr. Arcomano, a general surgeon who testified for Mr. Anderson, who opined that the infection was unrelated to the gangrene. The jury was free, however, to credit one expert's testimony over another. *See Designers of Georgetown v. E.C. Keys & Sons*, 436 A.2d 1280, 1282 (D.C.1981) ("Contradictory expert testimony presents an issue of fact for the fact-finder"); *McCrossin v. Hicks Chevrolet, Inc.*, 248 A.2d 917, 920 (D.C.1969) (jury question); *Christie v. Callahan*, 75 U.S.App.D.C. 133, 145, 124 F.2d 825, 837 (1941) ("it cannot be said, as a matter of law, that the X-ray experts' opinions carried so much weight ... as to require the jury to accept them and disregard the surgeons'").

assure himself that the juror could decide the case impartially. The judge found that the juror answered the questions "candidly, and, in the end, he was confident that he could decide this case on the evidence, and be fair to both sides." Given the juror's responses, we conclude that the judge's determination was not an abuse of discretion.

### C. *New Trial on Damages.*

██ The District's final argument is that a new trial is required on damages because Mr. Anderson's expert witness on earnings loss, Dr. Decker, testified on the basis of the improper assumption that Anderson was a bilateral amputee. The District maintains that because its liability was limited to the loss of Mr. Anderson's left leg, the relevant estimate should have been the earnings loss suffered by a single amputee. Although "[t]he trial court has broad discretion in granting or denying a motion for a new trial," *Pyne v. Jamaica Nutrition Holdings Ltd.,* 497 A.2d 118, 126 (D.C.1985), we conclude that the trial judge committed an abuse of discretion in denying the District's motion for a new trial on damages.[10]

Dr. Decker testified that his projections were based on Mr. Anderson's handicap "[b]elow the knee, BTK, bilateral amputation." His testimony did not separate the additional loss of earnings associated with the loss of the second leg. Because the scope of the District's liability was limited by the trial judge to the loss of Mr. Anderson's left leg, see Part III, *infra,* the expert's testimony should have been similarly limited. The jury was not presented with any other expert testimony properly limited to the loss of a single leg. Hence, although the judge instructed the jury to consider only damages for the loss of Mr. Anderson's left leg, there was no segregated evidence on which the jury could base its finding of damages.

The District did not object at the time of Dr. Decker's testimony that the bilateral amputee assumption was inappropriate.

This is understandable, however, since the District was not at that time aware that its liability would later be limited by the trial judge. In its motion for a new trial the District argued, among other things, that the verdict was excessive because the jury was only to consider the loss of one leg. Therefore, in addressing the District's motion for a new trial, the judge was alerted to the claim that Dr. Decker's estimate improperly had been based on a two-leg-loss assumption. Hence, the trial judge should have ordered a new trial on damages.

### III.

██ Mr. Anderson appeals on the ground that the trial judge erroneously concluded that there was insufficient evidence to demonstrate that the District was liable for the loss of his right leg. Mr. Anderson testified that at the time he was discharged from the District's correctional facilities, he was instructed to "just watch my diet. They said you're okay. Just watch your diet. They don't give me no medicine, nothing to take with me." Assuming that Mr. Anderson established that these instructions violated a standard of care, we conclude that the trial judge correctly ruled that there was "no evidence at all to support any inference that [the District's negligence] proximately caused the loss of Mr. Anderson's right leg."

Ordinarily in a medical malpractice case a plaintiff must introduce expert testimony to demonstrate proximate cause. *Eibl v. Kogan,* 494 A.2d 640, 642 (D.C.1985) ("it is incumbent upon the moving party, in order to present a *prima facie* case of negligence, to establish, by expert testimony, ... causation"); *Jones v. Miller,* 290 A.2d 587, 590 (D.C.1972) ("expert medical testimony may be required ... when in determining causation, complicated medical questions must be resolved"). Mr. Anderson relies on the following testimony

---

**10.** We therefore do not address the District's contention that the trial judge abused his discre-

tion in qualifying Dr. Decker as an expert.

by Dr. Arcomano, a general surgeon who treated Mr. Anderson:

Q: [by Mr. Anderson's attorney]: And if [a patient] was not informed [of the need for follow-up care] and consequently did not follow up, what would you expect of the peripheral vascular disease?

A: [by Dr. Arcomano]: It should progress.

Q: Would it progress to the point that he would lose his right leg?

A: Correct.

Q: Within reasonable medical probabilities, would you expect that he would lose his right leg?

A: I couldn't answer that.

Q: But there is a possibility that he could?

A: A possibility that he could.

Contrary to Mr. Anderson's assertion, this testimony, taken as a whole, is insufficient to demonstrate that the District's failure to inform Mr. Anderson of the need to monitor his condition caused the loss of his right leg. Although the doctor seemed to indicate that the disease should progress, even to the point of losing the leg, when asked to state an opinion "[w]ithin reasonable medical probabilities," the expert could not answer, but rather indicated that there was a "possibility" that the leg would be lost. A mere possibility does not establish proximate cause. *See Baltimore v. B.F. Goodrich Co.*, 545 A.2d 1228, 1232 (D.C.1988).

Nor is this a case in which the jury could find proximate cause without the aid of expert testimony. Mr. Anderson first experienced symptoms several months after his release from the correctional facility. He saw a private physician, who referred him to a specialist. Mr. Anderson delayed for two months, however, before making an appointment to see the specialist. Even when told that he should go to the hospital immediately or risk losing his leg, Mr. Anderson waited another two months. Under these circumstances, a layperson, "relying on common knowledge and experience," *Meek v. Shepard*, 484 A.2d 579, 581 (D.C.1984), could not find that the District's failure to inform Mr. Anderson of the need

for follow-up care proximately caused the loss of his right leg. Therefore, the trial judge correctly eliminated the issue of the loss of Mr. Anderson's right leg from the jury's consideration.

Accordingly, the judgment is reversed and the case is remanded for a new trial on damages.