Kenneth PRINCE, et al., Appellants,

v.

John FIRMAN, et al., Appellees.

No. 89–213.

District of Columbia Court of Appeals.

Argued May 2, 1990.
Decided Dec. 11, 1990.

---

Edmund H. Feldman, Washington, D.C., with whom Jeffrey Nadel, Culver City, Cal., was on the brief, for appellants.

Louis P. Robbins, with whom C. Francis Murphy, Washington, D.C., and John E. Prominski, Jr., Fairfax, Va., were on the brief, for appellees.

Before ROGERS, Chief Judge, and STEADMAN and FARRELL, Associate Judges.

STEADMAN, Associate Judge:

The question presented in this appeal is whether a District of Columbia statutory provision that church property revert to the contributors of the property upon dissolution of the church violates the free exercise clause of the First Amendment.[1] The provision in question, D.C.Code § 29–911 (1981), is part of a chapter dealing with "Religious Societies" and reads:

> Upon the dissolution of any society or congregation the estate and property of such society or congregation shall revert back to the persons, their heirs, and assigns who may have given or contributed to the purchase of or payment for the same, according to their respective rights.

We hold that the provision is constitutional.

## I

Plaintiff-appellants, two of six trustees of the Bethany Baptist Church of Washington, D.C. (the "Church"), sued the four remaining trustees of the Church, alleging, in pertinent part, that the defendant trustees failed to act properly with respect to the distribution of Church assets following the Church membership's vote to dissolve.[2] Specifically, the complaint stated:

---

1. At oral argument we *sua sponte* raised the issue of whether notice of the challenge to the constitutionality of the statute had been given to relevant government authorities pursuant to D.C.Civ.App.R. 52 (1989) or D.C.Super.Civ.R. 24(c) (1989). Apparently these provisions were, at best, only partially complied with. However, as in *Thatcher v. Tennessee Gas Transmission Co.*, 180 F.2d 644, 648 n. 7 (5th Cir.), *cert. denied*, 340 U.S. 829, 71 S.Ct. 66, 95 L.Ed. 609 (1950), the disposition reached here upholds the constitutionality of the statute at issue. We are instructing the clerk of our court to transmit

copies of this opinion to the Attorney General of the United States and the Corporation Counsel of the District of Columbia in the perhaps unlikely event that either may wish to intervene and participate in any further proceedings.

2. The plaintiffs also alleged that the defendant trustees permitted voting by proxy to take place, in violation of the "tenets and practice" of the Church. Although the voting issue is related to the distribution of assets issue insofar as it was "[b]y such means [as use of proxies that] the membership has adopted improper and illegal

10. The membership of the Church has voted to dissolve and to distribute its assets. The Church's building has been sold, and there were cash assets in excess of one million dollars to be distributed. Neither the membership nor the Trustees have made any attempt to ascertain to whom such remaining assets should be distributed in accordance with the law of the District of Columbia.

11. The membership has adopted a plan for the distribution of the Church assets, under which plan assets are to be and have been distributed to members and other persons, who under the law of the District of Columbia, are not the rightful recipients of those [assets]. In addition the distribution plan allows and encourages the membership to take for their own personal benefit assets of the Church which have been designated for distribution to charitable organizations.

12. In violation of their obligations and duties as Trustee, the defendants have failed and refused to take any action to stop the membership from carrying out the improper distribution of assets.

Appellees moved to dismiss the complaint pursuant to D.C.Super.Ct.Civ.R. 12(b)(6) (1989). During argument on the motion, the trial court itself raised for the first time the issue of the constitutionality of section 29–911. In granting the motion with prejudice, the court ruled that the section was unconstitutional and could not be enforced, and that adjudicating the complaint would "get [the court] into a matter of ecclesiastical government."

From the proceedings on appeal, we understand that appellants have abandoned any claims set forth in their complaint or relief sought thereunder except insofar as such claims or relief may be founded upon the provisions of section 29–911. We therefore deal solely with the issue of the constitutionality of section 29–911.

## II

■ At the outset, we note that we deal here with a challenge to the constitutionali-

ty of an Act of Congress. When we are required to pass on the constitutionality of an Act of Congress, we assume one of the " 'gravest and most delicate,' " *Fullilove v. Klutznick,* 448 U.S. 448, 472, 100 S.Ct. 2758, 2771, 65 L.Ed.2d 902 (1980) (plurality opinion) (citation omitted), duties we are called on to perform. *See Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 128, 3 L.Ed. 162 (1810) (Marshall, C.J.) ("[t]he question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case"). " 'Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a reasonable doubt.' " *Hornstein v. Barry,* 560 A.2d 530, 533–34 & 533 n. 5 (D.C.1989) (en banc) (citation omitted).

### A

■ The free exercise clause of the First Amendment provides that "Congress shall make no law … prohibiting the free exercise [of religion]." U.S. Const. Amend. I. The Supreme Court in several recent cases has spoken to the application of this clause. Speaking generally, the Court has stated that "[t]he free exercise clause means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Employment Div., Dep't of Human Resources v. Smith,* — U.S. —, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990). Thus, for example, "the First Amendment obviously excludes all 'governmental regulation of religious *beliefs* as such.' " *Id.* (quoting *Sherbert v. Verner,* 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963) (emphasis in original)). Nor may the government "coerce individuals into acting contrary to their religious beliefs." *Lyng v. Northwest Indian Cemetery Ass'n,* 485 U.S. 439, 450, 108 S.Ct. 1319, 1326, 99 L.Ed.2d 534 (1988).

As to specific cases, application of the free exercise clause will sometimes require

distributions of the Church's assets," appellants have not appealed the trial court's disposition as

to the voting issue as such and we do not therefore reach it.

an inquiry into "whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." *Hernandez v. Commissioner*, 490 U.S. 680, 109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989). Where the government seeks compliance with a " 'valid and neutral law of general applicability,' " *Smith, supra,* 110 S.Ct. at 1600 (quoting *United States v. Lee*, 455 U.S. 252, 263 n. 3, 102 S.Ct. 1051, 1058 n. 3, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring)), no such inquiry is necessary and the free exercise clause is not violated. *Id.* 110 S.Ct. at 1602–06.[3]

We think that the constitutionality of the statute at issue here may be sustained within these teachings. Its provisions take effect only "[u]pon the dissolution" of the religious society, at a point where its essentially religious function has presumably come to an end.[4] Thus, it is difficult to see how the statute can be said to place "a substantial burden on the observation of a central religious belief or practice." *Hernandez, supra,* 109 S.Ct. at 2148. Furthermore, in a significant sense, the statute seems to be an expression, albeit now of limited applicability, of what may be viewed as a neutral principle of property law.

Section 29–911 falls under chapter 9, entitled "Religious Societies," of Title 29 of the District of Columbia Code, dealing with corporations.[5] A somewhat similar provision appears in the immediately preceding chapter 8 of Title 29, applicable to institutions of learning. D.C.Code § 29–808 (1981). Section 29–808 provides that if an institution of learning fails to dispose of excess contributed property within a prescribed time, the excess "shall revert to the original donor, grantor, devisor, or their heirs."

An examination of the reversion principle contained in section 29–911 reveals that it has an origin in the common law of corporations generally. Blackstone relates, in dealing with the dissolution of corporations of all sorts, that upon dissolution the corporation's "lands and tenements shall revert to the person, or his heirs, who granted them to the corporation; for the law doth annex a condition to every such grant, that if the corporation be dissolved, the grantor shall have the lands again, because the cause of the grant faileth." 1 W. BLACKSTONE, COMMENTARIES *472. Various courts have concluded that this principle, "although no longer operative so far as business corporations are concerned, still prevails with relation to those of a public, religious, charitable, or fraternal description." 19 AM.JUR.2d *Corporations* § 2895, at 671 (1986). Indeed, it has been observed that "the law in the District of Columbia, as well as in most of the states, is that any

---

**3.** In *Smith*, the plaintiffs were members of a Native American church that used peyote as part of their ritual. They were fired from their jobs for use of peyote and denied state unemployment compensation because they were discharged for "misconduct." In rejecting their free exercise claim, the Court noted that there is a difference between "generally applicable, religion-neutral laws that have the *effect* of burdening a particular religious practice," *Smith, supra,* 110 S.Ct. at 1604 n. 3 (emphasis added), and laws *aimed* at disadvantaging particular religious practices. Likewise, in *Lyng, supra,* the Supreme Court emphasized that even governmental actions with "devastating effects" on religious practitioners do not necessarily violate the free exercise clause where such actions involve "the legitimate conduct by government of its own affairs." *Id.* 485 U.S. at 451, 108 S.Ct. at 1326.

**4.** There are no express limitations in chapter 9 on how a religious society may dispose of prop-

erty during its existence. No party contests the Church's freedom to dispose of property prior to "dissolution" unrestricted by the limits set in section 29–911.

**5.** The chapter on religious societies appears in nearly identical form in the 1901 codification of District of Columbia law. Act of Mar. 3, 1901, ch. 854, § 587, 31 Stat. 1189, 1282–83. The 1901 codification concerning religious societies was itself nearly identical to the original enactment on religious associations, contained in an act entitled "An Act to provide for the Creation of Corporations in the District of Columbia by General Law." Act of May 5, 1870, ch. 80, § 2, 16 Stat. 98, 99–100. Although the complaint does not specifically allege that the Church was organized under the predecessor of the current chapter 9, appellees so state in their brief. Present law also permits religious entities to organize under chapter 5 ("Nonprofit Corporations") or chapter 10 ("Charitable, Educational, and Religious Associations") of Title 29.

property which may have been given or contributed to the [religious] society reverts to the original donor or his heirs" upon dissolution. *Rose Campbell Mission v. Richardson*, 64 U.S.App.D.C. 21, 22, 73 F.2d 661, 662 (1934) (per curiam); *see The Late Corp. of the Church of Jesus Christ of Latter–Day Saints v. United States*, 136 U.S. 1, 47, 10 S.Ct. 792, 804, 34 L.Ed. 478 (1890) (as to public or charitable corporations, "the ancient and established rule prevails, namely: that when a corporation is dissolved, its personal property, like that of a man dying without heirs, ceases to be the subject of private ownership, and becomes subject to the disposal of the sovereign authority; whilst its real estate reverts or escheats to the grantor or donor");[6] *see also* 12 WEST CENTURY DIGEST CORPORATIONS § 1769 (1899) (digesting cases following the reversion rule). The history of section 29–911 thus shows that the rule it embodies reflects the early common law and was not specifically developed to subject religious institutions to the kind of discriminatory treatment which has been held to violate the free exercise clause.[7]

Furthermore, while it is true that we deal here with a reversionary interest provided by statute, we observe that the use of reversionary interests in private conveyances to religious associations has traditionally been very common. *See, e.g.,* C. HAAR & L. LIEBMAN, PROPERTY AND LAW 616 (2d ed.1985) (noting that conveyance containing reverter is among the "usual covenants" in deeds to churches);[8] *see also* 4 G. THOMPSON, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY § 1871, at 535 n. 40 (1979) (citing cases where deed to a church provided that the title would revert to the grantor "whenever the property should cease to be occupied for a church"). Appellees conceded at oral argument that civil court enforcement of a reverter in a private conveyance would be constitutional.

### B

Given our conclusion that section 29–911 is constitutional, we have no trouble concluding additionally that the trial court's adjudication of the application of the statute to this case would not impermissibly entangle the court in matters of religious governance. Courts, as a general matter, are permitted to adjudicate disputes between church factions concerning the disposition of church property. *Jones v. Wolf,* 443 U.S. 595, 602, 99 S.Ct. 3020,

---

6. The reverter principle has "been subjected to severe criticism," at least by some courts and commentators, not least because after passage of many years "it will be extremely difficult or impossible" to determine those entitled to the property. *In re Los Angeles County Pioneer Soc'y,* 40 Cal.2d 852, 865, 257 P.2d 1, 9, *cert. denied,* 346 U.S. 888, 74 S.Ct. 139, 98 L.Ed. 392 (1953); *see Huber v. Martin,* 127 Wis. 412, 435–36, 105 N.W. 1031, 1038–39 (1906); 19 AM JUR.2d, *supra,* at 672. The more contemporary view is that on dissolution a charitable organization's property is disposed of according to the doctrine of *cy pres. Id.;* 66 AM.JUR.2d *Religious Societies* § 68, at 820 (1973); 76 C.J.S. *Religious Societies* § 100, at 889 (1952); *Stevens Bros. Found., Inc. v. Commissioner,* 324 F.2d 633, 644 (8th Cir.1963), *cert. denied,* 376 U.S. 969, 84 S.Ct. 1135, 12 L.Ed.2d 84 (1964); Note, *Judicial Intervention in Disputes over the Use of Church Property,* 75 HARV.L.REV. 1142, 1146 (1962). We are not called upon at this point to deal with any questions involving the interpretation, scope, or practical application of section 29–911.

7. D.C.Code § 29–911 is thus distinguishable from the statute held violative of the free exer-

cise clause in *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952). The New York statute in *Kedroff* vested control of all Russian Orthodox churches in New York in the ecclesiastical body and hierarchy of the American metropolitan district even where the churches had formerly been administratively subject to the Moscow synod and patriarchate. 344 U.S. at 98–99, 73 S.Ct. at 145. The statute in *Kedroff* was expressly designed to curtail the religious authority of the Russian branch of the church. *Id.* at 109, 117, 73 S.Ct. at 151, 155.

8. In fact, the structure of chapter 9 suggests that it was primarily concerned with the issue of private conveyancing of real property to religious societies or congregations. The first section, 29–901, provides that it shall be lawful for such societies to receive or purchase "a quantity of land not exceeding an acre, and to erect thereon such houses and buildings ... as may be deemed necessary." Other provisions of the chapter, such as those dealing with "title to land," D.C.Code § 29–908, "[p]owers to convey property," *id.* § 29–909, and "[p]ower to mortgage," *id.* § 29–910, similarly indicate.

3025, 61 L.Ed.2d 775 (1979). As to how they do so,

> the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes. Indeed, "a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith."

*Id.* (citation omitted; emphasis in original). In this case, the court is being asked to do nothing other than apply a neutral property disposition rule involving "no consideration of doctrinal matters." *See Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 370, 90 S.Ct. 499, 501, 24 L.Ed.2d 582 (1970) (Brennan, J., concurring) (indicating that courts may rely on "special statutes governing church property arrangements" which have been "carefully drawn" to decide property disputes); *Mount Jezreel Christians Without a Home v. Board of Trustees of Mount Jezreel Baptist Church*, 582 A.2d 237 (D.C. 1990) (church members have standing to sue as trust beneficiaries under D.C.Code § 29–908 in dispute over use or disposition of church property); Gerstenblith, *Civil Court Resolution of Property Disputes Among Religious Organizations*, 39 Am.U. L.Rev. 513 (1990).

Reversed and remanded.