**Edwin T. OLIVER, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 95-CO-434.

District of Columbia Court of Appeals.

Argued May 14, 1996.

Decided Aug. 29, 1996.

---

Charles I. Cate, San Francisco, CA, appointed by the court, for appellant.

Eumi Choi, Assistant United States Attorney, Washington, DC, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Roy W. McLeese, III, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, SCHWELB, and KING, Associate Judges.

KING, Associate Judge:

Edwin T. Oliver challenges his criminal contempt[1] conviction, contending that the trial court erred in considering test results showing that he had violated the court's order to refrain from illegal drug use while on pretrial release. In particular, he contends that his motion to suppress the drug test results should have been granted on either of two grounds: (1) pretrial drug testing is not a statutorily permissible condition of release pursuant to D.C.Code § 23–1321 (1996 Repl.); or (2) mandatory pretrial drug testing is an unreasonable search and seizure in violation of the Fourth Amendment. We conclude that the trial court did not exceed its authority under the statute or the constitution when it ordered drug testing as a condition of pretrial release. There being no basis on which to suppress the results of Oliver's drug tests, we affirm.

## I.

On July 30, 1994, Oliver was arrested on

1. D.C.Code § 23–1329 (1996 Repl.).

drugs and weapons charges.[2] On August 1, 1994, the court released Oliver on his personal recognizance under the conditions that he report to the Pretrial Services Agency ("PSA") for placement in a drug treatment program and that he refrain from using controlled substances. During his arraignment on August 29, 1994, the trial court modified, without objection, Oliver's release order to include a condition that he report to PSA for weekly drug testing, which requires the giving of a urine sample for analysis.

Based on a December 1994 PSA report that Oliver was again[3] testing positive for illegal drug use, the trial court ordered him to show cause why he should not be held in criminal contempt for violating the conditions of his release. During a hearing on December 28, 1994, Oliver's counsel filed a written motion to suppress the results of his drug tests. The trial court, noting that a new PSA report indicated that Oliver had tested negative for illegal drugs since the order to show cause was issued, discharged the order, released Oliver on the same conditions, and dismissed as moot his motion to suppress.

In March of 1995, PSA notified the trial court that Oliver tested positive for illegal drug use on five separate occasions after the December 28 hearing. At a March 16, 1995 hearing, Oliver's counsel "renewed" his motion to suppress the drug test results. The trial court heard brief argument from Oliver's counsel, but did not rule on the motion, and scheduled a show cause hearing for March 20, 1995.

At the March 20 hearing, Oliver's counsel, orally and in a new written motion, again argued that the drug test condition violated

Oliver's constitutional rights. The trial court rejected Oliver's argument, and, after considering his numerous positive drug test results, found Oliver in criminal contempt of court.[4] This appeal followed.

## II.

In 1992 the Council of the District of Columbia ("Council") enacted amendments to the Bail Reform Act. D.C.Code § 23–1321(a) (1996 Repl.). Pursuant to D.C.Code § 23–1321 as amended, the trial court, when presented with a person charged with an offense other than first-degree murder or assault with intent to kill while armed, has a number of options, including the one taken here. If the court determines that unconditional release will not reasonably assure the appearance of the arrestee as required, or will endanger the safety of any other person or the community, the court imposes conditions of release to protect public safety and minimize the risk of flight. *See id.* The Council provided a nonexclusive list of possible conditions of release, including that the arrestee

> [r]eport on a regular basis to a designated law enforcement agency, pretrial services agency, or other agency; ... [r]efrain from excessive use of alcohol, or *any use of a narcotic drug or other controlled substance* without a prescription ...; [u]ndergo medical, psychological, or psychiatric *treatment, including treatment for drug* or alcohol *dependency* ...; [or s]atisfy *any other condition that is reasonably necessary.*

*Id.* § 23–1321(c)(1)(B)(ix)-(xiv) (emphasis added).

---

**2.** Carrying a pistol without a license, D.C.Code § 22–3204(a) (1996 Repl.); possession of a prohibited weapon, D.C.Code § 22–3214(a) (1996 Repl.); possession of an unregistered firearm, D.C.Code § 6–2311(a) (1996 Repl.); possession of unregistered ammunition, D.C.Code § 6–2361(3) (1996 Repl.); possession of marijuana, D.C.Code § 33–541(d) (1996 Repl.); and possession of PCP, D.C.Code § 33–541(d).

**3.** In October of 1994, PSA notified the trial court that Oliver had failed to report for a drug test on October 14 and tested positive for PCP use on October 21. At a status hearing on October 27, 1994, the trial court held Oliver in contempt for continuing to use drugs in violation of its order,

and sentenced him to four days in work-release. That contempt conviction is not at issue in this appeal.

**4.** The court sentenced Oliver to thirty days' incarceration, but suspended execution of the sentence on the condition that he refrain from using illegal drugs and report for drug testing two times per week. On July 11, 1995, however, after receiving a PSA report of Oliver's subsequent positive drug tests and missed test dates, the trial court revoked the suspension of Oliver's sentence and ordered him to serve the thirty days in jail, allowing for work-release.

## A.

Oliver contends that, because the Bail Reform Act does not specifically authorize drug testing as a condition of pretrial release, such a condition may not be imposed. *See id.* § 23–1321(c)(1)(B)(i)—(xiv). We disagree.[5]

■ "[A]ll courts, absent some specific statutory denial of power, possess ancillary powers to effectuate their jurisdiction ... [and] do all things that are reasonably necessary for the administration of justice within the scope of its judgments and mandates." *Morrow v. District of Columbia*, 135 U.S.App.D.C. 160, 169, 417 F.2d 728, 737 (1969) (citation and quotation marks omitted). More recently, we have recognized, as has the Supreme Court, the inherent equitable authority of a judicial tribunal to draw upon common law principles and to order a party to take action not specifically prescribed by statute. *See Ramos v. District of Columbia Dep't of Consumer & Reg. Affairs*, 601 A.2d 1069, 1073 (D.C.1992) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), but declining to extend *Chambers* to administrative agencies).

■ We are satisfied that the trial court had discretionary authority—implied by authority expressly granted under D.C.Code § 23–1321—to condition Oliver's release on his submission to drug testing. The Bail Reform Act specifically authorizes a trial court to impose pretrial release conditions requiring an arrestee to "[r]efrain from ... any use of a narcotic drug or other controlled substance without a prescription," D.C.Code § 23–1321(c)(1)(B)(ix), and to undergo treatment for drug dependency, *id.* § 23–1321(c)(1)(B)(x). The Council has thus determined that prevention of drug use may be a significant factor in preventing pretrial crimi-

nality or nonappearance in court. *Id.* § 23–1321(c)(1). If a court may order abstention from illegal drug use, *id.*, and may punish a violation of its order by invoking the contempt power, *see* D.C.Code § 11–944 (1995 Repl.); Super.Ct.Crim.R. 42 (1996), it must necessarily have the authority to test compliance with that order through drug testing. *See Ramos, supra,* 601 A.2d at 1073. Without such testing, the court ordinarily would have no reasonable means to determine whether the defendant has complied with the condition of his release proscribing use of unlawful drugs. *See In re Scott,* 517 A.2d 310, 312 (D.C.1986) (where the trial court stated that drug testing was the only immediate, clear way to determine whether a witness was abusing drugs, as the witness's credibility about her own drug use would be suspect).

Moreover, as discussed below, we conclude that drug testing may be a "reasonably necessary" condition for monitoring the express condition that the arrestee refrain from drug use. Because, pursuant to the statute, the trial court was expressly authorized to impose "any other condition that is *reasonably necessary* to assure the appearance of the person as required and to assure the safety of any other person and the community," the drug testing condition is permissible. D.C.Code § 23–1321(c)(1)(B)(xiv) (emphasis added). Thus, the trial court did not violate the statute in imposing a condition requiring drug testing.

## B.

■ We also reject Oliver's contention that the pretrial drug testing condition violated his rights guaranteed by the Fourth Amendment to the United States Constitution.[6] We conclude that the condition im-

---

5. The government argues that Oliver did not make this statutory argument in the trial court, and that we must therefore review for plain error. Oliver contends that his Fourth Amendment argument to the trial court made it·clear that the scope and meaning of § 23–1321 was under scrutiny and was unlawful. We need not decide whether the motion should be so read, because we find no error, let alone plain error. *See Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc).

6. Oliver did not initially object to the drug testing condition, nor did he ever ask that it be rescinded. In his motion to suppress the results of those tests, however, Oliver informed the trial court that he objected to the tests and that the results should not be used against him. The urine tests that the court considered in the contempt proceeding at issue here were all administered after the court was put on notice of Oliver's contention that the tests were unlawful. Therefore, on this record, we consider the issue preserved. Further, the government does not argue that Oliver's

posed is reasonable and, accordingly, does not violate the Fourth Amendment.

■■■ "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are *unreasonable*." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991) (citation omitted; emphasis added). The reasonableness of a particular type of search or seizure depends upon the strength of the governmental interests in conducting the intrusion, balanced against the nature and quality of the intrusion on the individual's liberty interests. *See, e.g., Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989); *O'Connor v. Ortega*, 480 U.S. 709, 715, 107 S.Ct. 1492, 1496–97, 94 L.Ed.2d 714 (1987) (plurality opinion); *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642–43, 77 L.Ed.2d 110 (1983).

In *In re York*, 9 Cal.4th 1133, 40 Cal. Rptr.2d 308, 892 P.2d 804 (1995), the Supreme Court of California upheld mandatory random pretrial drug testing against a statutory and constitutional challenge. The court affirmed the decision of the California Court of Appeals' holding that a court may condition pretrial release upon a defendant's agreement to submit to random drug testing, if a court has made an individualized determination that such conditions are warranted. *See id.* 40 Cal.Rptr.2d at 310–11 n. 3, 892 P.2d at 806–07 n. 3.[7]

The court held, however, that the imposition of pretrial release conditions "must be reasonable under the circumstances," *id.* 40 Cal.Rptr.2d at 319 n. 10, 892 P.2d at 815 n. 10, and that the drug testing condition was reasonable.[8] In so concluding, the court relied upon numerous other decisions[9] in which, in the context of probation, courts concluded that the intrusiveness of the government conduct authorized by the condition was outweighed by the strength of the government's interest in enforcing compliance with probation. *Id.*

■■■ Similarly, the governmental interest here outweighs the minimal intrusion imposed upon Oliver by the drug test requirement. Indeed, that interest is compelling: to protect the public from criminal activity and to assure the arrestee's appearance in court, while allowing the arrestee to remain free from detention pending trial. To that end, the Council enacted the amendments to D.C.Code § 23–1321, authorizing the court, as discussed above, to place conditions on an arrestee's pretrial release. By enacting that legislation, the Council determined that requiring arrestees to refrain from using illegal drugs may significantly inhibit pretrial crimi-

---

failure to move to vacate the drug testing condition precludes him from challenging his contempt conviction, *see Scott, supra*, 517 A.2d at 312–13, and we do not address that point.

**7.** The statutory authority to order drug testing was not as clear under California law when *York* was decided as it is in the District, because the applicable statute here explicitly authorizes the court to condition release on an agreement to refrain from illegal drug use. In California, the section of the statute relied upon as authorizing the court's action merely stated that a defendant shall not be released on personal recognizance until the person has filed a signed agreement which includes "[t]he defendant's promise to obey all reasonable conditions imposed by the court or magistrate." *York, supra*, 40 Cal. Rptr.2d 308, 892 P.2d at 807 n. 5 (quoting Cal.Penal Code § 1318(a)(2)). Nonetheless, the court concluded that the drug testing condition "clearly relate[s] to the prevention and detection of further crime and thus to the safety of the public." *Id.* 40 Cal.Rptr.2d at 314, 892 P.2d at 810.

**8.** The court also held that the drug testing condition did not infringe upon the presumption of

innocence to which arrestees are entitled *"at trial."* *York, supra*, 40 Cal.Rptr.2d 308, 892 P.2d at 812–13 (citing *Bell v. Wolfish*, 441 U.S. 520, 533, 99 S.Ct. 1861, 1870–71, 60 L.Ed.2d 447 (1979)). This court came to a similar conclusion in *Blunt v. United States*, 322 A.2d 579, 584 (D.C.1974), where we stated that "[t]he presumption of innocence ... has never been applied to situations other than the trial itself [and] the history of criminal jurisprudence ... reveals the inapplicability of the presumption to pretrial detention." Thus, to the extent Oliver claims a violation of the presumption of innocence, we reject his argument on the authority of *Blunt*. *See id.*

**9.** *See York, supra*, 40 Cal.Rptr.2d 308, 892 P.2d at 814 (citing, e.g., *United States v. Oliver*, 931 F.2d 463 (8th Cir.1991); *United States v. Duff*, 831 F.2d 176 (9th Cir.1987); *United States v. Williams*, 787 F.2d 1182 (7th Cir.1986); *People v. Mason*, 5 Cal.3d 759, 97 Cal.Rptr. 302, 488 P.2d 630 (1971) (disapproved on other grounds in *People v. Lent*, 15 Cal.3d 481, 124 Cal.Rptr. 905, 541 P.2d 545 (1975))).

nality and nonappearance at scheduled court dates.[10] We note that "[e]very possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a reasonable doubt." *Hornstein v. Barry*, 560 A.2d 530, 533–34 & n. 5 (D.C.1989) (en banc) (citations omitted); *see also Prince v. Firman*, 584 A.2d 8, 10 (D.C. 1990).

It can hardly be doubted that a rational basis exists for the Council's determination

that drug abuse may affect the user's reliability and is a significant contributing factor in the commission of crimes in the community. For example, this court has often remarked on the relationship between drug use and the user's credibility,[11] and between drug use and crime.[12] Perhaps more telling are the circumstances present in many criminal cases decided by us involving the coexistence of violence and drugs.[13] Moreover, numerous empirical studies have confirmed a strong correlation between an arrestee's use

**10.** *See Williams, supra* note 9, 787 F.2d at 1186 n. 8 (noting that Congress "specifically afforded the district courts statutory authority to require any probationer" with a drug problem to submit to drug treatment because it "recognized the correlation between drug use and criminal misconduct.").

**11.** In *Coates v. United States*, 558 A.2d 1148 (D.C.1989), we addressed the circumstances where expert testimony would be admissible to show that the credibility or recollection of a witness has been impaired by substance abuse, and we quoted (without necessarily subscribing to) another court's statements on the credibility of drug users:
> We believe it will be admitted that habitual users of opium, or other like narcotics, become notorious liars. The habit of lying comes doubtless from the fact that users of those narcotics pass the greater part of their lives in an unreal world, and thus become unable to distinguish between images and facts, between illusions and realities.

*Id.* at 1153–54 & n. 9 (quoting *State v. Fong Loon*, 29 Idaho 248, 158 P. 233 (1916)); *see also, e.g., Thompson v. United States*, 571 A.2d 192, 195 (D.C.1990) ("contempt conviction of appellant ... for violating the express condition of his pretrial release not to use drugs constitutes a criminal offense involving dishonesty and is usable for impeachment"); *Jones v. United States*, 548 A.2d 35, 39 (D.C.1988) (impeachment about prior cocaine use permissible where witness had testified that he was unaware of contents of cocaine packets; questions explored not only sophistication with respect to drugs, but also witness's general credibility); *Durant v. United States*, 292 A.2d 157, 161 (D.C.1972), *cert. denied*, 409 U.S. 1127, 93 S.Ct. 946, 35 L.Ed.2d 259 (1973) ("a prior conviction for ... [possession of narcotics] involves 'dishonesty or false statement' " and may be used to impeach a witness).

**12.** We have often observed that "drugs and weapons go together." *Marshall v. United States*, 623 A.2d 551, 555 (D.C.1992) (also agreeing with trial court that "it is simply plain common sense that there is an unfortunate coexistence of guns, money, drugs and violence") (quoting *Peay v. United States*, 597 A.2d 1318, 1321 (D.C.1991) (en banc) and citing *United*

*States v. Payne*, 256 U.S.App.D.C. 358, 361, 805 F.2d 1062 (1986)); *see also Irick v. United States*, 565 A.2d 26, 31 (D.C.1989) (noting "melancholy proposition" voiced by police drug expert that "when you relate to drugs and guns, it's like a marriage"). In *Gorham v. United States*, 339 A.2d 401 (D.C.1975) (en banc), we stated that "it has become increasingly evident that 'the problem of urban crime is largely a problem of heroin addiction. Once a user becomes an addict, [h]e is then bound to a treadmill that requires increasing amounts of heroin to feel healthy and increasing amounts of criminal activity to obtain the heroin.' " *Id.* at 403 n. 3 (quoting A.B.A. Special Committee on Crime Prevention and Control, *New Perspectives on Urban Crime* (1972)); *see also United States v. Williams*, 110 Daily Wash. L. Rptr. 1601 (April 1, 1982).

**13.** *See, e.g., Void v. United States*, 631 A.2d 374, 376 (D.C.1993) (affirming conviction for first-degree murder while armed, conspiracy to distribute, and possession with intent to distribute, PCP and cocaine); *Cowan v. United States*, 629 A.2d 496 (D.C.1993) (same—felony-murder while armed, second-degree murder, carrying pistol without license, and attempted distribution of cocaine); *Young v. United States*, 515 A.2d 1090 (D.C.1986) (same—second-degree murder while armed, first-degree burglary while armed, assault with dangerous weapon, possession of controlled substance).

In *Coates, supra*, a case involving the kidnapping and sexual assault where the victim and both defendants had used PCP at the time of the incident, we noted the testimony of an expert witness who observed that "[o]ne can read in the literature of people under the influence of PCP who have killed their own infants or loved members of their family, sometimes dismember them." 558 A.2d at 1151 n. 2; *see, e.g., Williams v. United States*, 655 A.2d 310 (D.C.1995) (multiple charges of murder, assault, burglary, and weapons offenses arising from a drug robbery and shooting death of two men); *Gray v. United States*, 585 A.2d 164 (D.C.1991) (defendant, apparently under the influence of PCP, had fired three shots from double-barrelled shotgun through screen door in direction of three children 20 to 30 feet away, and was convicted of

of illegal drugs on the one hand and both nonappearance and recidivism on the other.[14] Indeed, a representative of the District of Columbia Public Defender Service, in testimony before the Council regarding the very 1992 amendments to the Bail Reform Act that are at issue here, stated that "thousands of crimes" can be prevented by ensuring that drug treatment is immediately available to those who need it and that "[t]oo many crimes are committed over drugs, either by addicts desperate to obtain them, or by dealers desperate to sell them." [15]

Furthermore, the means, *i.e.*, drug testing, selected by the court to protect the applicable governmental interests could reasonably be viewed as the "least restrictive" available, as the statute requires. It may not be practical to ask a given arrestee whether he or she has been using drugs while on release, for there is no assurance that the arrestee will respond truthfully.[16] Testing is a reliable way to monitor drug use, and testing by analyzing urine samples is less intrusive than blood tests, and less restrictive than constant supervision or incarceration.

Finally, although we do not need to decide on this record whether the testing requirement may be imposed only where there is individualized suspicion, there was a clear basis for the trial court's imposition of a testing requirement upon Oliver. *See York, supra,* 40 Cal.Rptr.2d 308, 892 P.2d at 815 n. 10 (stating that "the reasonableness of a condition necessarily depends upon the relationship" of the condition to the crimes with which the defendant is charged and to the defendant's background). The very crimes

assault with intent to kill while armed); *Dixon v. United States,* 565 A.2d 72 (D.C.1989) (wife convicted of voluntary manslaughter of husband who, while under the influence of PCP, had swung a steel pole in an allegedly threatening manner).

**14.** *See, e.g.,* Jeffrey A. Roth & Paul B. Wice, Pretrial Release and Misconduct in the District of Columbia iii (PROMIS Research Pub. No. 16, 1980) ("Failure to appear seems unrelated to the charge or to community residence, but it *is* related to the fact of unemployment and drug use"); Kristin Williams, The Scope and Prediction of Recidivism 18 & 47–48 (PROMIS Research Pub. No. 10, 1979) (history of drug use a strong positive predictor of rearrest); Douglas A. Smith, et al., *Drug Use and Pretrial Misconduct in New York City,* 5 J. Quantitative Criminology 101, 123–24 (1989) (in analysis of urine test results and case information from persons arrested in New York City in 1984, the authors concluded that "[t]he data indicate that the number of drugs a person tests positive for is related to the probability of [failure to appear] and rearrest, even after controlling for other factors typically available to the judge at the time of the pretrial release decision.... [F]indings from the current study indicate that drug test information is significantly associated with the risk of pretrial misconduct.").

"Studies in the District of Columbia have shown that persons testing positive for drugs at the time of arrest have a higher probability of being rearrested, average more rearrests and are rearrested more quickly than arrestees who did not test positive for drugs over the pretrial period." Douglas A. Smith & Christina Polsenberg, *Specifying the Relationship Between Arrestee Drug Test Results and Recidivism,* 83 J.Crim.L. & Criminology 364, 367 (1992) (citing Mary A. Toberg et al., U.S. Dep't of Justice, Assessment of Pretrial Urine Testing in the District of Columbia (1989)).

The authors further explained that "regardless [of how the PSA data are analyzed], the results reveal a consistent picture: there is a clear and significant association between testing positive for drugs at the time of arrest and the probability of recidivism." Smith & Polsenberg, *supra,* at 373. Significantly, "among persons arrested in the District of Columbia in 1990, the presence of drugs in a urine specimen taken shortly after arrest (*i.e.,* drug-positive arrestee test results) is significantly associated with an increased probability that the person subsequently will be arrested for a new crime. This association persists even after other (non-drug) risk factors for recidivism, such as prior record, employment status and age, are taken into account." *Id.* at 376.

**15.** Angela Jordan Davis, Director, Public Defender Service for the District of Columbia, Comments on the Bail Reform Amendment Act of 1991 to D.C. City Council at 1, 13 (Dec. 19, 1991) (transcript available in *Council of the District of Columbia Report on Bill 9–360, the "Bail Reform Amendment Act of 1991,"* attach. 5, dated Jan. 23, 1992).

**16.** Studies have indicated that urine tests provide significantly more reliable data about recent drug use than does self-disclosure. *See* Smith, et al., *supra* note 14, at 102 ("[S]tudies comparing self-reports of drug use with urine test results indicate that one-half or fewer of arrestees or probationers who test positive will admit to recent drug use during confidential research interviews." [citations omitted]); *cf. Scott, supra,* 517 A.2d at 312 (trial court, expressing doubt that witness suspected of being under influence of illegal drugs would truthfully answer voir dire questions regarding her drug use, stated that drug testing was the only "immediate, clear way to get the answer").

with which Oliver was charged included unlawful possession of drugs, and he had three prior drug convictions in the District. In addition, Oliver admitted to the trial court that he had a drug problem,[17] and his counsel asked the court to release Oliver to enable him to "work on [his drug problem]." *See In re Wiggins,* 359 A.2d 579 (D.C.1976) (defendant who conceded in open court that he had knowingly violated two conditions of his release on personal recognizance, in effect confessed to contemptuous conduct).

For all of these reasons, we are in essential agreement with the analysis in *York,* and conclude that the drug testing condition was reasonable under the circumstances. *See York, supra,* 40 Cal.Rptr.2d 308, 892 P.2d at 814. Therefore, Oliver's contention that the drug test requirement violated his rights under the Fourth Amendment must fail.

### C.

In support of his constitutional claim, Oliver chiefly relies on *Berry v. District of Columbia,* 266 U.S.App.D.C. 127, 833 F.2d 1031 (1987). That reliance is misplaced.

In *Berry,* the plaintiff was arrested on drug charges and incarcerated after having failed to comply with conditions of his release. He filed a civil action against the District of Columbia, alleging, *inter alia,* that his constitutional rights were violated when he was ordered to submit to drug testing and treatment as a condition of his pretrial release. The district court granted summary judgment in favor of the District, concluding that Berry's arguments did not present issues of constitutional dimension. The court of appeals reversed the decision and remanded the case for further consideration of the constitutional issues raised by the District's drug testing and treatment program. The appellate court's focus was on whether the government's interests in the program outweighed any intrusion on Berry's legitimate liberty interests. The court stated that on remand, the District "must proffer reliable evidence, statistical or otherwise, from which the trial court can reasonably conclude that drug use makes it significantly more likely that an arrestee will commit crimes or fail to appear for scheduled court dates." *Id.* at 131, 833 F.2d at 1035.

In the present case, Oliver claims that, as in *Berry,* the government should be required to present, during the contempt hearing, empirical evidence supporting the reasonableness of the testing program. We disagree. First, as we have demonstrated above, there is abundant evidence, as reflected in many of our cases, the empirical studies cited, and in testimony before the Council,[18] of the correlation between drug use and recidivism and nonappearance in court. In *Berry,* none of this information was brought to the attention of the trial judge who had granted summary judgment. *Id.* at 130, 833 F.2d at 1034. The court of appeals did not hold that the testing program was unreasonable, nor did that court require the government in every case to provide statistical proof of a positive correlation between drug use and pretrial criminality or nonappearance. The court merely held that the grant of summary judgment must be reversed because the trial court did not have before it a sufficient record regarding the correlation between "drug use and pretrial criminality or non-appearance." *Id.,* 266 U.S.App.D.C. at 131, 833 F.2d at 1035.

Second, the court recognized that, if the drug testing condition is imposed only where the court has individualized suspicion of arrestees' drug use, then "the District's testing program will more likely than not be found reasonable." *Berry,* 266 U.S.App.D.C. at 131, 833 F.2d at 1035. In the present case, Oliver's prior drug-related convictions and his admission that he had a continuing drug problem plainly provided such individualized

---

**17.** Oliver advised the judge: "I have like a 12–year addiction off and on.... I'm not addicted to just one drug. It's three multiple drugs I'm addicted to, and I'm trying to deal with all three of them at one time."

**18.** At the time of the *Berry* case, § 23–1321 contained only a generalized provision as to permissible conditions of pretrial release and did not make any specific mention of a condition requiring the arrestee to refrain from using any narcotic drugs, such as was added in 1992. Thus, at the time of *Berry,* there was no legislative determination extant of the correlation between drug use and nonappearance and future criminal activity.

suspicion.[19] Accordingly, for the reasons stated, *Berry* does not support the claims made by Oliver here.

### III.

For the reasons stated, we conclude that requiring Oliver to submit to drug testing as a condition of his pretrial release was lawful and that the trial court properly denied his motion to suppress the results of his drug tests.

*Affirmed.*

---

19. As noted, *supra* at 192–193, we leave open the question of whether individualized suspicion must be shown before imposing the testing requirement.