**William R. COATES, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 87–1236.

District of Columbia Court of Appeals.

Argued Feb. 23, 1989.
Decided May 12, 1989.

---

SCHWELB, Associate Judge:

Coates appeals from his convictions of kidnapping while armed, D.C.Code §§ 22–2101, 3202 (1981), rape while armed, §§ 22–2801, 3202, sodomy, § 22–3502 and armed robbery, §§ 22–2901, 3202. He contends that the trial judge committed reversible error by declining to advise the jury in timely fashion that his prior convictions could be considered only in connection with his credibility as a witness and by refusing to admit expert testimony regarding the effects of PCP on the recollection of those who abuse it. We affirm.

I

*THE FACTS*

The case arose out of the armed kidnapping, rape and robbery of Nadine Hughes by Coates and his codefendant Paul A. McClaine. The principal issue at trial was whether Ms. Hughes had been forcibly abducted, robbed of a diamond ring, and compelled to engage in various sexual acts or whether the socialization and sexual activity were consensual. Both sides agreed that Ms. Hughes encountered the defendants when she was attempting to make a street purchase of unlawful drugs, and that all three parties smoked some marijuana laced with PCP. In other respects, the accounts varied widely, but the jury obviously believed Ms. Hughes. The sufficiency of the evidence to support the verdict is not, nor could it reasonably be, challenged.

II

*THE DELAYED IMPEACHMENT INSTRUCTION*

Karen L. Hochstein, Washington, D.C., for appellant.

Gregory E. Jackson, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before FERREN, BELSON and SCHWELB, Associate Judges.

Coates took the witness stand in his own defense. While he was testifying on direct examination, his counsel elicited from him his prior convictions. He did so "in order to draw the sting from the inevitable impeachment on cross-examination." *See Beale v. United States*, 465 A.2d 796, 800 (D.C.1983), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984). Counsel then asked for an immediate in-

struction to the effect that the convictions could be considered solely in connection with the defendant's credibility. *See* District of Columbia Criminal Jury Instruction No. 1.08 (3d ed. 1978).

The judge declined to give the instruction at that time, observing that Coates had not yet been impeached. He stated that the instruction would be given at the conclusion of Coates' testimony. After the direct examination had been completed, Coates' attorney said he was not going to request the impeachment instruction. The judge eventually gave the instruction when Coates was impeached with his prior convictions during cross-examination.

The judge later acknowledged that he should have given the impeachment instruction at the time it was initially requested. *See Kitt v. United States,* 379 A.2d 973, 975 (D.C.1977). He offered to correct the error by advising the jury that the instruction that the prior convictions could be considered solely in connection with Coates' credibility applied to their disclosure during the direct examination as well as to their mention during cross-examination. Defense counsel, however, declined the offer. Counsel did not move for a mistrial, and indicated that he did not intend to pursue the issue on appeal. The judge also included the impeachment instruction in his charge to the jury at the close of the case.

Under these circumstances, Coates' argument for reversal is less than convincing. *See Tillman v. United States,* 96 A.2d 272, 273 (D.C.1953). "We are not persuaded that juries which are properly instructed at the conclusion of a trial[1] will generally misapprehend, in the absence of an immediate cautionary instruction during trial, the limited purpose of the prior conviction evidence." *Dixon v. United States,* 287 A.2d 89, 99 (D.C.), *cert. denied,* 407 U.S. 926, 92 S.Ct. 2474, 32 L.Ed.2d 813 (1972). As Justice Holmes put it three quarters of a century ago in *Graham v. United States,* 231 U.S. 474, 481, 34 S.Ct. 148, 152, 58 L.Ed. 319 (1913):

It would be absurd to upset a verdict upon a speculation that the jury did not do their duty and follow the instructions of the court.

We are satisfied that the judge did all that he could to undo any mischief that could have resulted from the delay in giving the impeachment instruction, that the defense declined his offer to take any additional remedial steps, and that the delay in any event did not substantially affect the jury's decision. *Kitt, supra,* 379 A.2d at 975.

### III

### *THE EXCLUSION OF EXPERT TESTIMONY*

#### A. *The Voir Dire*

■■ Ms. Hughes acknowledged that she took two puffs of a marijuana cigarette laced with PCP. Coates testified that he and Ms. Hughes were both "high" during what he described as their consensual sexual activity, but that thereafter she acted "hyper" and "paranoid." Claiming that PCP sometimes made him violent and impaired his memory, Coates sought to adduce expert testimony concerning the effects of PCP on abusers of the drug as a group in order to show that Ms. Hughes' perception and memory were probably impaired. His counsel proffered the testimony of Victor Cohn, a professor of pharmacology at George Washington University.

Outside the presence of the jury, Professor Cohn testified that he had done considerable work on PCP while serving with the National Institute of Drug Abuse, although his direct observation of abusers of the drug was limited to examination of videotapes of approximately a dozen of them. The trial judge found Professor Cohn's expertise in the general area sufficient, but questioned the admissibility of the proffered evidence. Accordingly, Professor Cohn's proposed testimony was explored in detail during the course of a comprehensive *voir dire.*

---

**1.** Or, as here, both at the time of impeachment and at the conclusion of the trial.

Professor Cohn testified that PCP interferes with the way the brain processes information which it receives from the various senses. As a result, people sometimes feel that they are not in touch with reality and experience a sensation of "floating in air." He related that the drug may impair memory to the point of amnesia, so that users often have no recollection, after the effects of the drug have worn off, of anything that took place while they were under the influence of the PCP. He testified that PCP may generate some sense of confusion, leading to delusional and paranoid behavior. According to Professor Cohn, users may act in a very violent and irrational way following use of the drug.[2]

Professor Cohn acknowledged, however, that the effect of PCP on a given person is "very unpredictable." Judge Walton questioned him on the subject, and received the following responses:

THE COURT: Doctor, in evaluating the effect that PCP has on a person, can you categorically say that it's going to have a certain effect on a person without having examined that person to make any type of assessment in reference to that person's tolerance, et cetera?

THE WITNESS: I think the answer to your question is no. The basis for that is that the drug itself, is very, very unpredictable, and the response of individuals is variable, and the exact response in a given individual is going to be dependent in part on the dose of the drug that person ingested at the time, the extent to which they have used that or other drugs previously or concurrently, as well as some environmental facts that are totally unrelated to the drug. Where you happen to be at the time you used the drug may influence exactly the precise effect of the drug.

There are some things, however, that I think are probably constant in terms of

the sense that the drug has its basic mechanism of action in disrupting normal thought processes and in disrupting the interpretation of information coming into the brain, how the brain processes that.

What is variable is the extent of the behavioral things that ensue from that; does that make sense?

THE COURT: Yes, I understand.

Do you feel confident giving a scientific opinion in reference to the use of PCP and what effect it would have on a person, based only upon information from someone indicating that they had smoked PCP, without knowledge as to how strong it was, whether in fact it was PCP, et cetera?

THE WITNESS: Well, because of the effect of PCP on memory, I would consider information from somebody who had been using PCP, about what took place when they were using PCP, as probably unreliable.

Subsequently, the prosecutor asked Professor Cohn about the state of scientific knowledge as to how a particular person would react to the use of PCP. Dr. Cohn replied that although one could predict with certainty the effect of the drug on the heart rate, blood pressure, and eyes,

I would defy anybody to make such a prediction [in terms of behavior] unless you got to a dose that actually rendered a person semiconscious or unconscious. . . .

Judge Walton ruled that the evidence as proffered was inadmissible. He concluded that although Professor Cohn was "eminently qualified" in the area of pharmacology, he (the judge) had serious concerns about the witness' expertise on the effect of street drugs on a person's behavior. Based on Professor Cohn's testimony as to "the state of the art,"[3] the judge concluded

---

**2.** According to Professor Cohn,

One can read in the literature of people under the influence of PCP who have killed their own infants or loved members of their family, sometimes dismember them. People have taken off all their clothes and gone down the main streets of the town in which they

lived. People [have] tried to stop locomotives with their outstretched hands.

**3.** Aside from any issue as to the "state of the art," the judge stated of Dr. Cohn that "he individually does not have sufficient expertise as far as that is concerned." This finding was apparently based in part on Dr. Cohn's limited experi-

that the witness could not testify with a reasonable degree of scientific certainty as to whether a person previously under the influence of PCP would be unreliable, when no longer under the influence, in relating what occurred during the time that he was intoxicated. Judge Walton indicated that he would permit Professor Cohn to testify if, after talking with Ms. Hughes or her boyfriend about her drug abuse, he could say with a reasonable degree of medical certainty that the drug would have impaired her memory of the events in question. The professor was never called to testify.

### B. *The Law*

The trial judge has wide latitude in the admission or exclusion of expert testimony, and his decision with respect thereto should be sustained unless it is manifestly erroneous. *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *Clifford v. United States,* 532 A.2d 628, 631 (D.C.1987). This broad discretion exists because the trial judge has an opportunity, not available to a reviewing court, to observe, hear, and otherwise evaluate the prospective expert witness. *Ibn Tamas v. United States,* 407 A.2d 626, 635 (D.C.1979). Where, as in this case, the judge previewed the evidence during *voir dire,* gave careful consideration to the various facts involved, and suggested an evidently reasonable accommodation,[4] his decision should not be lightly disturbed.

Nevertheless, the judge's discretion is not without constraints. The right of a criminal defendant to call witnesses is a fundamental one, and the exclusion of a defense witness raises serious constitutional concerns. *Washington v. Texas,* 388 U.S. 14, 17–19, 87 S.Ct. 1920, 1922–23, 18 L.Ed.2d 1019 (1967); *King v. United States,* 550 A.2d 348 (D.C.1988); *Clifford, supra,* 532 A.2d at 638. More specifically, the defense has the right to introduce appropriate expert testimony. *Kaplan v. California,* 413 U.S. 115, 121, 93 S.Ct. 2680, 2685, 37 L.Ed.2d 492 (1973); *Clifford, supra,* 532 A.2d at 632. Expert opinion evidence should generally be admitted if it will assist the jury to understand the facts in issue. *Clifford, supra,* 532 A.2d at 632. Expert testimony must derive from a science or art sufficiently advanced to permit its practitioners to reach a reasonable opinion about the matter in question; speculation may properly be excluded. *Dyas v. United States,* 376 A.2d 827, 832 (D.C.), *cert. denied,* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977).[5] Short of pure speculation, however, the degree of certainty with which a particular expert witness proffers an opinion goes to the weight of the testimony, not to its admissibility. *Clifford, supra,* 532 A.2d at 639; *Sponaugle v. Pre-Term, Inc.,* 411 A.2d 366, 367 (D.C.1980).[6]

This court has held that the use of unlawful drugs is a proper subject of inquiry going to the credibility of a witness and his recollection of the events in question. *Durant v. United States,* 551 A.2d 1318, 1326

---

ence in observing PCP users, which consisted of viewing four or five video tapes of them.

**4.** We refer to Judge Walton's suggestion that Professor Cohn acquaint himself with the complaining witness' drug use and determine whether he could then predict the effect of PCP ingestion *on her* in a manner sufficiently reliable to meet the standard set by the judge.

**5.** For expert testimony to be admissible,

(1) the subject matter "must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman"; (2) "the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid

the trier in his search for truth"; and (3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert."

*Dyas, supra,* 376 A.2d at 832.

**6.** In light of these authorities, we cannot agree with the trial judge's invocation of "reasonable degree of scientific certainty," apparently borrowed from medical malpractice litigation, as a prerequisite for finding Professor Cohn's testimony admissible. The defense never challenged the judge's articulation of this standard, however, and it appears in context to have been somewhat incidental to his overall analysis. Accordingly, our disagreement with the judge on this point does not require us to reverse the conviction.

(D.C.1988); *Jackson v. United States,* 377 A.2d 1151, 1154 (D.C.1977). We have not, however, squarely addressed the question whether, and under what circumstances, expert testimony is admissible to show that the credibility or recollection of a witness has been impaired by his or her substance abuse.[7] Our federal colleagues across the street have "recognize[d] the desirability of increasing judicial appreciation of the general effects of drug use on perception, memory and credibility that expert testimony may bring to this troublesome issue." *United States v. Leonard,* 161 U.S.App.D. C. 36, 53, 494 F.2d 955, 972 (1974).[8] *Durant* suggests a similar disposition on the part of this court. 551 A.2d at 1328.

Courts in other jurisdictions have taken a variety of approaches to the issue. Some have admitted evidence of drug use without requiring either expert testimony or proof that the witness' testimonial capacity was impaired, usually on the theory that drug abusers, and particularly those addicted to opiates or cocaine, suffer both from impaired recollection and from a disposition to lie. *See, e.g., Chicago & N.W. Ry. Co. v. McKenna,* 74 F.2d 155, 159 (8th Cir.1934); *State v. Fong Loon,* 29 Idaho 248, 158 P. 233 (1916).[9] Other courts have indicated that expert testimony is admissible to es-

tablish the unreliability of the testimony of a drug abuser. *See, e.g., State v. Smith,* 103 Wash. 267, 174 P. 9 (1918) ("the defense was entitled to prove, by expert testimony, the effect of the drug upon the mind and memory of its user"); *United States v. Harris,* 542 F.2d 1283, 1303 (7th Cir.1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977) (court admitted expert testimony that addict's credibility is minimal and that his recollection of events while under influence of heroin might be false); *People v. Balderas,* 41 Cal.3d 144, 191–92, 222 Cal.Rptr. 184, 210–11, 711 P.2d 480, 507 (1985) ("evidence of habitual narcotics or alcohol use is not admissible to impeach perception or memory unless there is expert testimony on the probable effect of such use on those faculties"). In a leading case, a divided New York Court of Appeals, acknowledging the novelty and difficulty of the issue, emphasized the scholarship reflecting that drug abuse affects different people in different ways, and stated that

> it is only after a long and serious deliberation that we hold inadmissible expert testimony that narcotics addicts of the same type as a witness are unworthy of belief in the absence of a clear and con-

---

**7.** *But see Smith v. United States,* 315 A.2d 163, 168 (D.C.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974) (trial judge did not abuse discretion in excluding, as impermissibly speculative, expert medical testimony with respect to the effect of the ingestion of one tablet of Desoxyn, a weight control drug, on a witness' ability to see); *Durant v. United States, supra,* 551 A.2d at 1328 (presence of PCP in defendant's urine held improperly admitted for purpose of calling into question defendant's ability to perceive and recall events of that date; court observed that "expert testimony might have imparted probative value to the medical evidence in order to establish a proper foundation for its use as extrinsic impeachment evidence").

**8.** The court held in *Leonard,* however, that the trial judge did not abuse his discretion by excluding extrinsic testimony to rebut a witness' denial of drug use or expert testimony regarding the general effects of habitual drug use.

**9.** In *Fong Loon,* in a much quoted passage, the court said:

> We believe it will be admitted that habitual users of opium, or other like narcotics, be-

come notorious liars. The habit of lying comes doubtless from the fact that the users of those narcotics pass the greater part of their lives in an unreal world, and thus become unable to distinguish between images and facts, between illusions and realities. In Wharton & Stille's Medical Jurisprudence (3d Ed.) § 1111, it is said that: 'Of the mental symptoms,' in the case of a morphinomaniac or other habitual users of drugs 'the most characteristic, perhaps, are the moral perversions. The chronic morphinomaniac is often a confirmed liar. The truth is not in him. * * * There is something quite pathological in this mendacity; the lying is unblushing, inexpert, spontaneous—a sort of second nature. * * * They have been so often narcotized, and thus cut off from actualities, living in a dreamstate, that they do not seem able to recognize realities when they see them.' * * * The capacity of a witness to observe and to receive accurate impressions, to retain them in his memory, and to correctly relate them, also his power and inclination to be truthful, are all subjects which go to the credibility of a witness. * * *

29 Idaho at 258, 158 P. at 236.

vincing showing to the full satisfaction of the trial judge that such is the consensus of medical and scientific opinion. The reliability of such a thesis must be clearly established before a jury may be subjected to its influence.

*People v. Williams*, 6 N.Y.2d 18, 26, 187 N.Y.S.2d 750, 159 N.E.2d 549, 554 (1959), *cert. denied*, 361 U.S. 920, 80 S.Ct. 266, 4 L.Ed.2d 188 (1959); *but see* the dissenting opinion of Justices Desmond and Fuld, *id.* at 6 N.Y.S.2d 29–32, 187 N.Y.S.2d at 757–58, 159 N.E.2d at 556–58; *see also Kelly v. Maryland Casualty Co.*, 45 F.2d 782 (D.W. Va.1929), *aff'd*, 45 F.2d 788 (4th Cir.1930) (examining judicial and medical authorities on the reliability or lack thereof of drug abusers, and excluding proffered expert testimony to the effect that abuser of drugs is unreliable and "ready to feign anything"; the court cited the lack of any consensus of medical opinion).[10]

Except to remark that the approach of the Supreme Court of Idaho in *Fong Loon* has probably been shown to be too one-dimensional in the light of the variety of scientific opinions expressed on the issue in the seventy-three years since that case was decided,[11] we need not decide here which, if any, of these various precedents we should adopt. In none of them, so far as we are able to discern, has it been held that expert testimony as to the effect of a drug in the abstract *must* be admitted in spite of the expert's acknowledgment that different people react differently depending on the amount of the drug ingested and the particular characteristics of the abuser. As the court observed in *Hansford v. United States*, 124 U.S.App.D.C. 387, 390, 365 F.2d 920, 923 (1966):

the effects of narcotics use will vary depending on the amount of drugs taken, the degree of tolerance developed by the individual, and the idiosyncratic reaction of the person to the drugs.

Indeed, this court has recognized that

the effect of narcotics on credibility cannot be assessed without knowledge of the type of drug involved, the type of reaction it causes, the amount of the drug the witness was using at the time he observed the event in issue, *and the mental characteristics of the individual who is testifying ...*

*Durant, supra*, 551 A.2d at 1328 n. 12, quoting from WEINSTEIN'S EVIDENCE, *supra*, ¶ 607[04], at 607–61 (emphasis added).

In the present case, Professor Cohn had not examined or spoken with Ms. Hughes and proffered no testimony about her personal reaction to PCP. The defense declined the judge's offer to have its expert interview her or her boyfriend to learn more about her. The amount of PCP which the witness acknowledged ingesting was relatively small. The fact that she had ingested the drug was fully disclosed and argued to the jury. To be sure, Professor Cohn's generalization, apparently applicable to all PCP users without distinction, that he would consider "probably unreliable" *any* information from someone who had been using PCP about what took place at the time of its use might be viewed as sufficiently broad to have some bearing on Ms. Hughes' individual credibility. It would not have been an abuse of discretion to admit the evidence, for observation of the individual who allegedly used the drugs is not necessarily a prerequisite for qualifying an expert to testify. We are nevertheless of the opinion that Judge Walton exercised his discretion reasonably when he concluded that Professor Cohn's qualifications for making this particular assertion had not been sufficiently established, especially in light of the small amount of PCP involved. This conclusion is further but-

---

**10.** Judge Weinstein has observed that

[I]f, as may happen, there is no medical consensus about the effect narcotic usage had on a particular witness' ability to perceive recall and narrate, the court must then consider whether allowing this question to be debated by the experts would not confuse rather than enlighten the jury.

J. WEINSTEIN & M. BERGER, 3 WEINSTEIN'S EVIDENCE ¶ 607[04], at 607–61 (1987).

**11.** In *Godfrey v. United States*, 122 U.S.App.D.C. 285, 287, 353 F.2d 456, 458 (1966), the court described as "obviously erroneous" the trial judge's instruction to the jury that "it is recognized that a drug addict is inherently a perjurer when his own interests are concerned...."

tressed by Professor Cohn's acknowledgment of the existence of variable factors and his failure to utilize the opportunity provided by the judge to assess how those variables applied in the case of Ms. Hughes. Accordingly, the judgment of conviction appealed from is hereby *Affirmed.*