David J. HAIDAK, M.D.,
Appellant/Cross–
Appellee,

v.

Paul J. CORSO, M.D., Appellee/Cross–
Appellant,

and

Washington Hospital Center
Corporation, Appellee.

No. 02–CV–892, 02–CV–925.

District of Columbia Court of Appeals.

Argued Dec. 16, 2003.
Decided Jan. 29, 2004.

Martin Lobel, with whom Lee Ellen Helfrich and Henry M. Banta were on the brief, for appellant/cross-appellee.

Lee T. Ellis, Jr., with whom Ralph G. Blasey, III and Elizabeth A. Scully were on the brief, for Paul J. Corso, M.D., appellee/cross-appellant.

Albert D. Brault, with whom Joan F. Brault was on the brief, for appellee Washington Hospital Center Corporation.

Before SCHWELB and GLICKMAN, Associate Judges, and NEBEKER, Senior Judge.

NEBEKER, Senior Judge:

These consolidated appeals arise out of a jury tried medical malpractice suit filed by appellant, Dr. David Haidak, against his surgeon, Dr. Paul Corso, and the Washington Hospital Center (the Center), alleging

that, after undergoing coronary bypass surgery, they negligently failed to provide proper care and failed properly to treat Dr. Haidak's ischemic optic neuropathy (ION—a process in which the optic nerve is starved of oxygen and which can, and in this case did, result in degrees of blindness). The jury, by a special verdict, decided that Dr. Corso and the Center failed in their duty of care and treatment, but that such failure did not proximately cause the ensuing malady. Dr. Haidak first asserts that the trial court erred when it refused to provide the jury with an instruction on Dr. Haidak's abandonment theory of causation; second, that it erred when it refused to allow several of Dr. Haidak's experts to testify about the cause, prevention, and treatment of ION; third, the trial court erred when it refused to allow plaintiff's ophthalmologist expert to testify about the likelihood of successful treatment of ION because the expert reached an opinion on the issue after he gave deposition testimony and appellees had no notice of his newly formed opinion; and fourth, the trial court erred when it refused to admit the package instructions for Levophed, a drug given to Dr. Haidak as part of his post-operative care. We are unable to agree with any of these contentions and, therefore, affirm.[1]

## I. Factual Background

Appellant, Dr. Haidak, underwent lifesaving coronary by-pass surgery performed by Dr. Paul Corso at the Washington Hospital Center. Dr. Haidak, who is a board certified internist, hematologist and oncologist, and his wife met with Dr. Corso on September 9, 1998 (five days before the surgery). They testified that they informed him that Dr. Haidak becomes hypotensive after surgery. After surgery, Dr. Haidak was moved to the cardiovascular recovery room. Some time thereafter, his blood pressure decreased and he became hypotensive. He was then administered Levophed, a medication used to increase blood pressure. The package insert to Levophed says it is contraindicated for patients who are hypotensive except as an emergency measure. Dr. Haidak remained on Levophed for approximately 36 hours.

At 1:50 a.m. on September 15, Dr. Haidak was given one unit of packed red blood cells in an attempt to raise his blood pressure. He was given a second unit at 10:00 p.m. on the 15th. At approximately 4:45 a.m. on September 16, Dr. Haidak informed an Intensive Care Unit (ICU) nurse that he was losing vision in his left eye. The nurse informed the physician's assistant, who took no action and did not notify Dr. Corso. Dr. Corso checked on Dr. Haidak at 6:20 a.m. on September 16.

At 8:25 a.m. on September 16, Dr. Haidak was transferred to the "step down unit" at the Center. At that time he was assessed by a nurse and nurse practitioner. There is no evidence in the hospital records that Dr. Haidak made any complaints at this time. Dr. Haidak's wife, Cecily Holiday, and his father stayed with him for most of the 16th.[2] The next record of Dr. Haidak complaining about vision loss was at 1:00 p.m. on the 16th, when Dr. Leiboff, Dr. Haidak's cardiologist, checked in on Dr. Haidak. Dr. Leiboff informed the nurse practitioner then on duty, Stacey Miller, that Dr. Haidak was complaining of loss of vision and requested that she order

1. Dr. Corso and the Center have cross appealed. We do not reach the errors they assigned since we affirm the judgment in favor of the appellees. Thus, it is not necessary for us to decide, *sua sponte*, whether the Center and Dr. Corso could appeal from their ultimately favorable judgment.

2. Dr. haidak's father died before trial.

an ophthalmology consultation with Dr. Kolsky, a neuro-ophthalmologist affiliated with the Center. Nurse Miller's notes reflect that she requested the consultation at 1:00 p.m. Subsequent complaints by Dr. Haidak were noted in his record at 3:00 p.m. and 6:45 p.m. that day.

At 8:00 p.m. the nurse practitioner then on duty, Elizabeth Davis, called the Eye Clinic for a consultation. Dr. Anne Burnley responded at 8:30 p.m., diagnosed the problem as ischemic optic neuropathy (ION), and called Dr. Kolsky. After initiating treatment, Dr. Haidak's vision eventually stabilized. By this time, however, Dr. Haidak was effectively blind in his left eye and had a scotoma (blind spot) in his right eye.

Dr. Haidak posited two alternative theories of causation: first, that the defendant's inadequate care, including the administration of Levophed, was a contributing cause of Dr. Haidak's developing ION; second, that the defendants abandoned and failed adequately to treat Dr. Haidak throughout the day of September 16. The jury found that the Center and Dr. Corso breached the standard of care, but that neither defendant's negligence was the proximate cause of injury.

The trial court refused to instruct the jury on the issue of abandonment. The court ruled that two of Dr. Haidak's experts were not qualified to render an opinion on ION, and that a third expert was not allowed to testify on matters not contained in the Rule 26(b)(4) pretrial Statement. It also denied a request by the jury to view the package insert for the Levophed administered to Dr. Haidak as part of his post-operative care because it was not identified as an exhibit in the Joint Pretrial Statement and had not been properly introduced into evidence at trial.

## II. Analysis

### Abandonment

One of Dr. Haidak's theories of proximate cause was that he was abandoned by Dr. Corso and the Center staff and that this abandonment was a contributing cause of the development of ION. Dr. Haidak requested a jury instruction on that theory in the Rule 16 Pretrial Statement, to which Dr. Corso objected. Dr. Haidak claims on appeal that the fact the trial court denied Dr. Corso and the Center's request for a directed verdict (pursuant to Super. Ct. Civ. R. 50) meant the court determined there was sufficient evidence as to that issue and that it should have instructed the jury as to the abandonment theory. Dr. Haidak argues the court's failure to do so was clear error. We disagree.

The trial judge must submit an instruction on a party's theory of damages to the jury if the theory is sufficiently supported by the evidence. *Wingfield v. Peoples Drug Store, Inc.*, 379 A.2d 685, 688 (D.C.1977). "[I]n determining whether a proposed instruction on a party's theory of the case was properly denied, we review the record in the light most favorable to [the requesting] party." *Nelson v. McCreary*, 694 A.2d 897, 901 (D.C.1997) (citing *Wilson v. United States*, 673 A.2d 670, 673 (D.C.1996)). Abandonment is defined "as the termination of the professional relationship between the physician and patient at an unreasonable time or without affording the patient the opportunity to procure an equally qualified replacement." *Miller v. Greater Southeast Community Hosp.*, 508 A.2d 927, 929 (D.C.1986) (citations omitted). Reviewing the record in the light most favorable to Dr. Haidak, as we must, we conclude that the trial judge did not err because there was insufficient evidence in the record to support a claim of abandonment.

The primary case on which Dr. Haidak relies is *Ascher v. Gutierrez*, 175 U.S.App. D.C. 100, 533 F.2d 1235 (1976). *Ascher* provides an excellent example of the sort of fact pattern necessary to present the issue of abandonment to a jury: Ascher was a patient in a surgical procedure for which Dr. Gutierrez was the scheduled anesthesiologist. Dr. Gutierrez administered sodium pentothal at 12:55 p.m., and within two or three minutes Ascher developed laryngospasm, a condition in which spasms of the throat muscles prevent the intake of oxygen. Dr. Gutierrez left the operating room at 1:30 p.m. to attend another operation; after weighing conflicting evidence, the jury determined that he was not replaced by another anesthesiologist. The court noted that the jury could have found that Ascher was not intubated until at least 1:45 p.m. (thereby restoring the flow of oxygen to her lungs and blood). The court upheld the jury's finding that, because Dr. Gutierrez left Ascher while she was being treated, and because he was not replaced by another anesthesiologist, Gutierrez abandoned his patient.

In this case, there is no evidence to suggest, nor does Dr. Haidak argue, that Dr. Corso terminated his doctor/patient relationship with Dr. Haidak, or that Dr. Corso should have been replaced by another cardiac surgeon. On the contrary, the record shows that after Dr. Corso performed successful cardiac surgery, Dr. Haidak was transferred to an intensive care unit for cardiac patients. Dr. Haidak's treatment was monitored by a team of physicians, physician's assistants, nurse practitioners, and nurses. Dr. Corso visited Dr. Haidak again the next morning, September 16, at 6:25 a.m. At 8:25 that morning, Dr. Haidak was transferred to a patient room (or so-called step down unit) where he was assessed by a nurse and nurse practitioner. He was seen on several other occasions that day by various hospital personnel. The essence of Dr. Haidak's complaint, both at trial and on appeal, is that the standard of care was inadequate insofar as hospital personnel failed properly to respond to knowledge of his medical condition. Thus the issue is one of the competency and adequacy of care, not whether or not care was terminated.

The facts at hand are similar to those of *Johnson v. Bernard*, 388 A.2d 490 (D.C. 1978). In that case, Johnson had a tooth extracted by Dr. Bernard, an oral surgeon. Johnson was sedated for the procedure, and ten to twenty-five minutes later she was ambulatory and moved to a recovery area. Dr. Bernard's assistant checked on Johnson once and at some point thereafter; Dr. Bernard came to check on her as well. Dr. Bernard found Johnson unconscious and evidencing a severe lack of oxygen. The trial court refused to give the jury an instruction on the issue of abandonment. On appeal, we held that "the evidence did not show a termination of the doctor-patient relationship[, but] did show that Dr. Bernard provided intermittent rather than continuous care, raising a question of negligence—not abandonment." *Id.* at 492 (citations and footnote omitted). As in *Johnson*, Dr. Haidak may have experienced intermittent care, but the evidence, viewed in the light most favorable to Dr. Haidak, does not support a claim of abandonment.

### Expert Witnesses

Dr. Haidak argues that the trial court committed multiple errors with respect to evidentiary issues relating to his expert witnesses. In particular, he claims that the trial court abused its discretion when it limited or rejected expert testimony of Drs. Vacanti, Dobrzynski, Miller, and Strom with respect to ION. Dr. Haidak also claims the trial court erred when it

refused to allow Dr. Haidak's ophthalmologist, Dr. Hurwitz, to testify as to his opinion on the effective treatment of ION. Dr. Hurwitz had not reached an opinion when he gave his deposition testimony.

We note at the outset that much of the argument turns on the similarities and differences between ischemia generally and ION in particular, both as to causation, prevention, and treatment. Questions and answers pertaining to the effective treatment of ION are relevant to determinations of a breach of the standard of care; their relevance to causation, if any, is more limited. Moreover, since the jury determined that Dr. Corso and the Center did in fact breach the standard of care, we attempt to confine our analysis as much as possible to issues involving the causation and prevention of ION (to the extent that proof of the possibility, if any, of prevention helps to establish causation). All of Dr. Haidak's experts except Dr. Hurwitz testified, or were prepared to testify, that ION and ischemia are caused by the same phenomenon: a deprivation of oxygen. The issue then becomes how and why that deprivation occurs and whether the ION that may result is preventable.[3]

■ We review the admission or exclusion of expert testimony for abuse of discretion. *District of Columbia v. Anderson*, 597 A.2d 1295, 1299 (D.C.1991). The trial judge's decision will be affirmed unless it is manifestly erroneous. *Eason v. United States*, 687 A.2d 922, 925 (D.C. 1996), *aff'd in pertinent part*, 704 A.2d 284, 285 (D.C.1997) (en banc) (per curiam); *Coates v. United States*, 558 A.2d 1148, 1152 (D.C.1989). In *Dyas v. United*

*States*, 376 A.2d 827 (D.C.), *cert. denied*, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977), we set forth a three-part test for the admission of expert testimony: (1) the subject matter "must be so distinctively related to some science, profession, business or occupation *as to be beyond the ken of the average layman*"; (2) "the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference *will probably aid the trier in his search for truth*"; and (3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert." *Dyas, supra*, 376 A.2d at 832, quoting MCCORMICK ON EVIDENCE, § 13, at 29–31 (E.Cleary, 2d ed.1972). The first part of this test is not at issue in this case. We look to the record and the trial court's rulings with respect to each doctor and his respective area of expertise and testimony to determine whether it satisfies the second and third parts of the test.

*Dr. Charles Vacanti*

■ Dr. Haidak offered Dr. Vacanti, a professor of medicine and an anesthesiologist, as an expert in the standard of care of the physicians and patients in a hospital, anesthesia, and the treatment of ischemia. After voir dire, the court accepted him as an expert with respect to medical records, the standard of care with respect to treatment of ischemia generally, and the standard of care for anesthesiology. Dr. Haidak did not object when the court declined to qualify Dr. Vacanti to testify about the treatment of ION. Dr. Vacanti had never

---

**3.** Or as Dr. Vacanti, one of Dr. Haidak's experts, put it:

The bottom line cause *is*—and everybody will agree to it, study or no study—is that the optic nerve is not receiving enough oxygen to function normally and starts to die.... What isn't known is specifically which factors are more important in causing the low oxygen delivery. And you can't answer that question because there are many, many factors ....

treated a patient with ION, nor was he familiar with its effects or treatment. He had never lectured or conducted research on ION. He also testified that he did not believe that Dr. Corso's actions caused the ION.

Dr. Haidak claims that the trial court's decision to limit Dr. Vacanti's testimony to ischemia generally, and thereby exclude testimony as to ION, was manifestly erroneous and an abuse of discretion.[4] *Coates, supra,* 558 A.2d at 1152; *Ornoff v. Kuhn & Kogan Chartered,* 549 A.2d 728, 731 (D.C. 1988). To support this proposition, Dr. Haidak refers us to *Baerman,* in which the United States Court of Appeals for the District of Columbia Circuit held that a " 'physician is not incompetent to testify as an expert merely because he is not a specialist in the particular field of which he speaks.' " *Baerman v. Reisinger,* 124 U.S.App. D.C. 180, 181, 363 F.2d 309, 310 (1966) (quoting *Sher v. De Haven,* 91 U.S.App. D.C. 257, 262, 199 F.2d 777, 782 (1952) (other citations omitted)). The *Baerman* court was persuaded by the record that the physician was knowledgeable about the subject matter about which he would have testified, and held that it was thus error to exclude his testimony. *Id.* We are not persuaded, on this record, that the trial judge erred by ruling that Dr. Vacanti was not knowledgeable about ION.

■ In any event, despite the limitations imposed on Dr. Vacanti's testimony, a review of the record reveals that he was, in fact, allowed to testify about ION on cross examination:

Q: [Y]ou do not know, with any degree of medical certainty—reasonable medical certainty whether there are any

treatments that would reverse or even improve the prognosis of ION?

A: The—that question is not known to anybody, particularly.

The question was then rephrased to include prevention of ION, to which the doctor again responded that no one "knows with absolute certainty, that is correct." A lengthy discussion followed as to the appropriate degree of certainty, but Dr. Vacanti never offered to testify to a reasonable degree of medical certainty that ION is preventable.

We, therefore, need not decide whether Dr. Vacanti had "sufficient skill, knowledge, or experience," *Dyas, supra,* to testify as an expert with respect to ION, or whether his testimony should have been allowed on direct examination pursuant to *Baerman.* The trial court did not exclude testimony on cross examination, and any prejudice to Dr. Haidak was minimal.

### Dr. Robert Dobrzynski

■ Dr. Robert Dobrzynski, a hematologist, was qualified as an expert with respect to the admissibility of attending and admitting physicians, hospital medical records, and hematology "and areas relating to hematology." Dr. Dobrzynski was not offered as an expert on ION, and the trial court held that he was not qualified to testify about ischemia or ION. Nevertheless, Dr. Dobrzynski testified that ION and ischemia are essentially equivalent, that ischemia is treatable, and that it can be prevented.

Dr. Haidak now argues the trial court erred when it refused to allow Dr. Dobrzynski to respond to the question: "[c]an you tell from the records who breached the standard of care by not treating Dr. Hai-

---

4. Dr. Haidak also claims error with respect to the trial court's refusal to admit Dr. Vacanti's proffered testimony as to the physician assistant's failure to report Dr. Haidak's symp-

toms. This argument pertains to the standard of care and we need not address it. Further, we do not agree that such testimony illuminated the issue of abandonment.

dak once he started loses his vision?" Since this question goes to the standard of care, not to causation, it is irrelevant to our analysis of the latter issue. Moreover, subsequent testimony by Dr. Dobrzynski on cross examination reveals that the court did not abuse its discretion when it limited testimony on direct:

Q: [With respect to ION] your experience is essentially zero?

A: Essentially zero, yeah.

Q: And you've never treated a patient with it?

A: No I have not.

Q: You've never been called to consult on it?

A: I wouldn't be, no.

Q: [T]he fact is that no other organ was affected by ischemia throughout this man's body, isn't that true?

A: That appears to be true, yes.

Q: You don't know because you're not an ophthalmologist whether that means to us and to a neurophthalmologist that there must have been something different about the eye, does it?

A: I have no way of knowing that. There's no way of knowing that, no.

Regardless of whether ION should be considered an area "relating to hematology," we cannot fault the trial judge in ruling that Dr. Dobrzynski's skill, knowledge, or experience with ION would not have materially aided the finder of fact. *Dyas, supra.* Therefore there was no abuse of discretion with respect to the testimonial limitations placed on this witness.

### Dr. Neil Miller

■ Dr. Neil Miller, a neuro-ophthalmologist, testified about the standard of care and causation for ION. Dr. Miller testified that the physician assistant's decision not to notify a physician when Dr. Haidak reported the "purple disc" in his vision did not satisfy the standard of care. He also testified that the seven-hour delay in receiving the ophthalmology consultation was a breach of the standard of care. With respect to causation, Dr. Miller could not testify with a reasonable degree of medical certainty that ION can be prevented, or that there is a reliable treatment for this condition, or that the delay in responding to Dr. Haidak's complaints harmed him.

Dr. Miller testified that ION "is exactly the same as ischemia anywhere in the body," but he could not state to a reasonable degree of medical certainty that ION can be prevented. On appeal, Dr. Haidak argues that Dr. Miller misconstrued the term reasonable medical certainty, which we have defined as "an objectively well founded conviction that the likelihood of one cause is greater than any other; it does not mean the expert is 'personally certain' of the cause … or that the cause is discernible to a certainty." *Robinson v. Group Health Ass'n,* 691 A.2d 1147, 1150 (D.C.1997) (citation omitted). We find Dr. Haidak's argument questionable and, even if true, irrelevant.

Dr. Miller was the only witness proffered as an expert on ION specifically. Dr. Haidak draws our attention to a remark by Dr. Miller about the "gold standard" for treatment of ION, and suggests that this standard is inconsistent with, and more demanding than, the reasonable degree of medical certainty standard required. Dr. Miller's remarks, however, were in response to Dr. Haidak's question: "Now, what would be the gold standard in determining which treatment worked to treat ION?" The subsequent exchange did not revolve around that standard:

Q: To a reasonable degree of medical certainty can you say that it can be— ION can be prevented?

A: No, sir, I cannot say that.

Q: Is the standard of care ... that ION that it should be treated as soon as possible? ...

A: Yes, sir.

Q: Did the failure to respond to his vision loss complaint harm him?

A: I can't say that to a reasonable degree of medical certainty.

There is nothing in the record to support an argument that Dr. Miller meant something other than that he had "an objectively well-founded conviction" that there was no medical certainty that delayed response to Dr. Haidak's complaint of loss of vision harmed him. While Dr. Miller testified that the applicable standard of care requires the physician to treat ION right away, he also said "[w]e don't know [whether earlier treatment is better than later treatment] because people generally don't get better no matter what."

The question whether Dr. Miller based his answers on an incorrect understanding of the proper standard is irrelevant, however, because the "gold standard" question and answer pertained to proper *treatment* of ION, and thus the standard of care. They did not pertain to the prevention of ION, and thus contribute little, if anything, to a determination of causation. We, therefore, conclude that the trial judge did not abuse his discretion when he subsequently limited Dr. Miller's testimony as to causation of ION.

### Dr. Byron Hurwitz

 Dr. Byron Hurwitz, Dr. Haidak's treating ophthalmologist, gave conflicting pretrial deposition testimony as to his opinion regarding whether there is any known effective treatment for ION. Dr. Hurwitz first stated that he was prepared to testify at trial that the treatment given Dr. Haidak by Drs. Burnley and Kolsky halted the progression of ION. In response to a subsequent question, however, Dr.

Hurwitz stated that he did not know whether there was any known effective treatment for postoperative ION. On cross-examination at trial, Dr. Hurwitz stated that he was ready to change his testimony regarding the availability of effective treatment for ION. Three days later, after the testimony of Dr. Miller, Dr. Haidak requested that he be allowed to recall Dr. Hurwitz for the purpose of testifying to a reasonable degree of medical certainty that earlier treatment *could* have prevented damage to Dr. Haidak's vision. The trial court sustained an objection and forbade further testimony as to this. The court noted that Dr. Haidak had not informed the parties that Dr. Hurwitz would have an opinion on the treatment and prevention of ION in his Rule 26(b)(4) filing.

 Dr. Haidak claims the court erred and abused its discretion when it refused to allow him to recall Dr. Hurwitz to testify that he had reached an expert opinion, to a reasonable degree of medical certainty, that earlier treatment would have reduced the extent of the injury to Dr. Haidak. In excluding the evidence, the trial court focused on the lack of notice to Dr. Corso and the Center: "They didn't get notice and they had no reason to expect based on this deposition that he was going to enter into this area.... They didn't have a chance to prepare for it. They didn't have a chance to respond in other parts of their case to it, it's not fair." We note that Rule 26(f)(1)(B) imposes a duty on parties to supplement the subject matter and substance of expected testimony. Super. Ct. Civ. R. 26. *See also Weiner v. Kneller*, 557 A.2d 1306, 1309 (D.C.1989). Failure to supplement the statement may result in sanctions, including the exclusion of evidence, by the court. *Id.* The trial judge's determination whether the sanction imposed is "a penalty too strict or unnecessary under the circum-

stances" is reviewed for abuse of discretion. *Henneke v. Sommer*, 431 A.2d 6, 8 (D.C.1981) (citation omitted). The party seeking to introduce testimony improperly omitted from the 26(b)(4) statement must satisfy a standard based on the following five factors:

(1) whether allowing the evidence would incurably surprise or prejudice the opposite party;

(2) whether excluding the evidence would incurably prejudice the party seeking to introduce it;

(3) whether the party seeking to introduce the testimony failed to comply with the evidentiary rules inadvertently or willfully;

(4) the impact of allowing the proposed testimony on the orderliness and efficiency of the trial; and

(5) the impact of excluding the proposed testimony on the completeness of information before the court or jury.

*Weiner, supra,* 557 A.2d at 1311–12.

Review of the record convinces us that the trial judge focused on his concern that the evidence would incurably surprise appellees. *See id.* at 1309, "[t]he primary purpose of [the Rule] and the accompanying sanctions is to prevent unfair surprise . . . ." Dr. Hurwitz was offered to testify as Dr. Haidak's ophthalmologist, not as an expert on ION. As the trial court noted, the deposition testimony of Dr. Hurwitz gave no indication that he was prepared to offer an opinion, to a reasonable degree of medical certainty, regarding whether ION is preventable. Moreover, Dr. Hurwitz stated he would defer to Dr. Miller, as a neuro-ophthalmologist, for an opinion on that subject.

The court was also clearly concerned with the orderliness and efficiency of the trial. Dr. Hurwitz initially testified on July 23, and, on July 26, Dr. Haidak requested permission to recall him. Dr. Haidak suggested that the court allow further depositions to be taken over the weekend, thereby enabling Dr. Corso and the Center adequately to prepare for this new testimony. The court rejected this suggestion, noting, *inter alia,* that further testimony from Dr. Hurwitz as to causation could require Dr. Corso and the Center to make considerable revisions in their strategy and in the presentation of their defense. We defer to the trial judge's evaluation of the case at that point in time and find no abuse of discretion.

### Dr. Mark Strom

Dr. Mark Strom, a cardiac surgeon, was qualified as an expert witness to testify as to medical records, the standard of care for admitting physicians, and cardiac surgery. After voir dire, the trial court struck Dr. Strom's testimony regarding ION and Levophed. Prior to trial, Dr. Corso moved to exclude Dr. Strom as an expert. His motion was denied. Dr. Corso renewed his objection before Strom began his testimony and the trial judge agreed to voir dire Dr. Strom with respect to testimony pertaining to Levophed. Dr. Strom testified that he no longer practiced surgery, had never used Levophed, had never written any articles or conducted research on Levophed, and was unable to give an opinion about the correct dosage of Levophed. With respect to ION, Dr. Strom testified that he had never treated anyone with ION and that he had no opinion as to whether earlier treatment would have prevented its occurrence in Dr. Haidak's case.[5] Dr. Strom's qualifications as a cardiac surgeon are not in dispute.

---

**5.** Dr. Strom was, however, prepared to testify to a reasonable degree of medical certainty that ischemia can be prevented and treated.

 Appellees assert on appeal, as they did at trial, that Dr. Strom did not have "sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference *will probably aid the trier in his search for truth." Dyas, supra,* 376 A.2d at 832. Thus, we examine whether Dr. Strom was properly qualified to testify as an expert on ION and the use of Levophed. An expert's "opinion must be based on fact or adequate data .... [N]ot a mere guess or conjecture." *Sponaugle v. Pre–Term, Inc.,* 411 A.2d 366, 367 (D.C.1980). Expert testimony may be excluded when the expert is unable to show a reliable basis for their theory. *Hollander v. Sandoz Pharm. Corp.,* 289 F.3d 1193, 1208 (10th Cir.2002). Where there is an articulable reason to doubt an expert's competency in a particular area, the trial judge need not qualify the witness. *Glorious Food, Inc. v. Georgetown Prospect Place Assoc.,* 648 A.2d 946, 948 (D.C.1994).

 With respect to Levophed, Dr. Strom testified at deposition and during voir dire that he never used it, that it wasn't used much anymore, that he had never conducted any studies, tests, trials, or research on it, that he did not know proper dosages, and that he could not testify that Levophed caused ION. The foregoing admissions are sufficient to support the trial judge's conclusion that Dr. Strom did not have a reliable basis for his conclusions on the usage of Levophed and that he had inadequate knowledge and experience about Levophed to aid the jury in its search for truth.

 With respect to ION, Dr. Strom was deposed as follows:

> Dr. Strom: ... I believe that this particular complication [ION] is a preventable complication and should not occur, period.

Q: Have you seen any literature that is that definite about it?

A: I can't cite anything right now.

Dr. Strom also stated that he would defer to an ophthalmologist as to whether treatment could prevent development of ION. Dr. Haidak points to the following exchange, which took place at a bench conference during Dr. Strom's testimony, as showing that the trial court impermissibly intruded on the province of the jury by making findings of fact:

> The Court: [T]he only ischemia that is relevant here is ION. That is it. You're going to have to take him down the rest of the road here to qualify him. You've not done that.... But just to leave it off is ischemia is ischemia is ischemia doesn't get you there based on the evidence provided in the case thus far. Mr. Jacobovitz [co-counsel for Dr. Haidak]: ... There have been three witnesses, I believe, and I have my notes, that have testified that there is no difference between ischemia and ION. And so that's an issue of fact-
>
> The Court: Let me suggest something to you, I think that we have, the evidence that I understand is ischemia is the same thing whatever the organ is— i.e., it's a deprivation of oxygen.
>
> Mr. Jacobovitz: Right.
>
> The Court: That doesn't necessarily mean I can't—I don't think that one can infer from that or the testimony that's been provided here that the treatment for all types of ischemia are the same. ION is a different animal based on the testimony that I've heard. It really is. So, if you're gonna use this guy-
>
> Mr. Lobel: Right.
>
> The Court:—to testify about the treatment of ION you're going to have to qualify him to do that. That's the ischemia we're concerned about. That's the ischemia that's relevant to this case.

We do not view this as anything but a ruling on expert witness qualification. Thus, we hold that the trial court did not abuse its discretion in excluding Dr. Strom's testimony.

### Levophed Package Insert

 Dr. Haidak claims that the protracted administration of Levophed after his coronary by-pass surgery contributed to his development of ION. Levophed is a powerful vasoconstrictor used post-operatively to maintain the flow of blood to the heart and brain. The package insert to Levophed states that it should not be given to hypotensive patients (such as Dr. Haidak) except as an emergency measure, and lists as an adverse reaction: "ischemic injury due to potent vasoconstrictor action and tissue hypoxia." In order to meet his burden of causation, Dr. Haidak sought to introduce the package insert into evidence through the testimony of Dr. Strom. The trial court determined that the insert should not be admitted through the testimony of Dr. Strom, however, because the judge considered Dr. Strom unqualified to testify about Levophed. The jury requested a copy of the package insert when they began their deliberations. The trial court declined the request, noting that Dr. Haidak had failed to introduce the insert into evidence at trial.[6]

We have held that a package insert is " 'not conclusive evidence of the standard or accepted practice in the use of the drug by physicians and surgeons, nor that a departure from such directions is negligent. But it is *prima facie* proof of a proper method of use ....' " *Garvey v. O'Donoghue*, 530 A.2d 1141, 1145–46 (D.C. 1987) (quoting *Julien v. Barker*, 75 Idaho 413, 272 P.2d 718, 724 (1954)). Although package inserts are normally admissible, Dr. Haidak, despite numerous opportunities, never offered the package insert into evidence.[7] This failure compels us to conclude the trial court did not abuse its discretion.

For the foregoing reasons, we affirm the judgment.

---

6. The trial judge commented that "[i]f you had offered it [at trial] I think I would have admitted it. In fact, I am quite sure I would, but it never was offered at that point."

7. Dr. Haidak could have, but did not, use another of his experts to introduce the package insert.